WISE & CO. *v.* MORGAN.

101  273
117  403

*(Knoxville.* October 1, 1898.)

1. NEW TRIAL. *Motion for.*

Under a rule of practice that requires a motion for new trial to specify the grounds relied on or the same shall be deemed waived, it is essential, in order to preserve the right to assign errors in Supreme Court, to set out, in the motion, errors that occurred at and during the trial, but not errors that occurred before the trial, in the rulings upon the pleadings. (*Post, pp. 276, 277.*)

2. NEGLIGENCE. *Breach of statute.*

It is well settled that a failure to perform a statutory duty is negligence *per se*, and if the injury is the proximate result or consequence of the negligent act, there is liability. (*Post, p. 278.*)

Case cited: Queen *v.* Dayton Coal Co., 95 Tenn., 458.

3. DRUGGISTS. *Failure to label poisons.*

The druggist's negligence in failing to label a poisonous liquid or substance, as required by statute, is the cause of a child's death, killed by drinking it, and not the mother's act in permitting the same to remain within reach of the child, or the child's act in drinking it, when the mother was not informed of the poisonous character of the liquid or substance, and the child had not reached the years of discretion. (*Post, pp. 278–280.*)

4. SAME. *Same.*

The statute that forbids and declares it a misdemeanor for any person to sell or deliver "any poisonous liquid or substance without having the word ' poison ' written or printed on the label attached to the vial, box, or parcel in which the same is sold," does not apply to medicines containing poisonous ingredients compounded by druggists upon the prescriptions of physicians. (*Post, pp. 280–285.*)

Code construed: § 6745 (S.); § 5634 (M. & V.); § 4830 (T. & S.).

17 P—18

5. STATUTES. *Construction.*

    The Legislature cannot be supposed to intend its own stultification, and therefore, the Courts will restrain the language of a statute so as to avoid a construction that would lead to absurd consequences. The presumption against absurdity is probably a more powerful guide in the construction of statutes than the presumption against inconvenience or injustice. (*Post, pp. 282, 283.*)

---

### FROM HAMILTON.

---

Appeal from Circuit Court of Hamilton County. FLOYD ESTILL, J.

PRITCHARD & SIZER for Wise & Co.

W. T. MURRAY for Morgan.

McALISTER, J. Defendant in error recovered a verdict and judgment in the Circuit Court of Hamilton County, against Harry Wise & Co., for the sum of $3,000 damages for the negligent killing of his daughter, Ella Morgan, a child about three years old. The facts of the case are few and practically undisputed. In August, 1894, the child, being troubled with her eyes, was taken by her mother to an oculist for treatment. After an examination of the child's eyes, the oculist handed her mother the following prescription, to wit:

"Sulphate of atropia, one grain; acid boracic, two grains; water, two drachms; mix. Label: Two drops in right eye three times a day.

                        "DR. F. T. S."

This prescription was filled by the firm of Harry Wise & Co., druggists of experience and established reputation in the city of Chattanooga. It was filled in exact conformity with the formula, and a label was pasted on the bottle, showing the ingredients of the prescription, its number, and the date it was filled. This bottle· was taken home by the mother and placed on the mantelpiece, some three or four feet from the floor. The medicine was used by the mother for four or five days in the treatment of the child's eye, and was then discontinued, but the bottle was still left on the mantelpiece. About two weeks after the treatment with this medicine was discontinued, the child, in the absence of its mother, and while left alone in the room, got a chair, climbed up to the mantel, procured the bottle, and poured a portion of the mixture in a cup and drank it. In a short time thereafter she developed all the symptoms of atropia, or belladonna poison, and died on the following day. The father thereupon brought this suit, as administrator, against the defendants, to recover damages for the death of the child. The gravamen of the action is that defendants failed to label the bottle "poison," as required by the statute, and that the death of the child was the proximate result of this negligence or breach of duty on the part of defendants.

The cause has been three times tried. The first verdict was for $1,000, which was set aside by the Circuit Judge upon the ground that the negligence

of defendants was not the proximate cause of the child's death. The second trial resulted in a verdict for $500, which was set aside for the same reason. On the third and last trial, plaintiff recovered a verdict for $5,000, and pending the motion for a new trial, he entered a remittitur of $2,000, and thereupon the Circuit Judge overruled the motion for a new trial, and pronounced judgment for the sum of $3,000.

Wise & Co. appealed, and have · assigned errors. Plaintiff insists that assignments of error Nos. 1, 2, 4, 10, and part of 11, cannot be considered by this Court because not assigned on the motion for a new trial in the Court below, as required by the rule of that Court.

The first assignment in this Court is that the Circuit Court erred in overruling demurrer to plaintiff's declaration. Second, in sustaining plaintiff's demurrer to defendants' second and third pleas.

Counsel are in error in supposing that it was necessary to embody the questions made on the demurrer in the motion for a new trial. The demurrers had been acted on prior to the trial, and the action of the Court entered upon the minutes. Since the action of the Court upon the demurrers was in nowise connected with the trial of the cause, it was not necessary that such matters should again be brought to the attention of the Court on motion for a new trial. It is true that matters presented in assignments Nos. 4, 10, and part of 11, were

not presented on the motion for a new trial, as required by the rule of Court, and will not be considered by this Court. *Bruce & Wife* v. *Hale*, MS. opinion, Knoxville, September term, 1898.

The fifth assignment is that the Court erred in refusing the following request, namely: "If, taking into consideration the intelligence of the person to whom the substance was sold, and the purpose for which it was intended to be used, the druggist had no reason to anticipate or presume that it would be taken internally, then the taking of it internally, and the death resulting therefrom, would not be such a probable or natural result of the failure to label the bottle as would make the defendant liable."

The sixth assignment is that the Court erred in refusing the following request, namely: "If the mother put this bottle where she thought the child would not get it, and the child, unexpectedly to the mother, got a chair and climbed up to the mantelpiece, procured the medicine and drank it, then the drinking of the medicine, and the death of the child, was not the natural or probable result of the failure to put the poison label on the bottle, and the defendant would not be liable."

The seventh assignment is that the Court erred in refusing the following request, namely: "If the obtaining of the medicine by the child was not due to any fault or negligence of the plaintiff, and if the presence of the poison label would not have

deterred the child from drinking the substance, then the failure to put on such label would not be the proximate cause of the child's death, and the defendant would not be liable."

The eighth assignment is that the Court erred in refusing the following request, namely: "If the substance sold to Mrs. Morgan, from the drinking of which her child died, was not poisonous or dangerous when used for the purpose or in the manner it was intended, as indicated by the prescription on which it was sold, then the defendant was not required, under the statute, to put a poison label on the bottle in which it was contained, and his failure to do so would not be negligence."

It is argued, in support of these propositions, that if it be conceded that the failure to affix the poison label was negligence *per se*, yet that act was not the proximate cause of the injury, for the reason that the chain of causation was broken (1) by the fact that the drinking of the substance was not the natural or probable result of the failure to put on the label; and (2) by the intervening negligence of the mother in leaving the bottle accessible to the child.

It is well settled that a failure to perform a statutory duty is negligence *per se*, and if the injury is the proximate result or consequence of the negligent act, there is liability.  2 Thomp. on Neg., p. 1232, Sec. 5; *Queen* v. *Dayton Coal Co.*, 11 Pick., 458; 57 Am. Dec., 461.

But it is insisted that the mother's negligence, in leaving the bottle accessible to the child, was such intervening negligence on the part of a responsible agent as broke the chain of causation, and became itself the juridical cause. This might be so if the mother had been aware of the poisonous character of the substance, but it is not claimed she had such knowledge, and her testimony is quite positive that she was ignorant of it. If the bottle had been labeled "poison," the mother would thereby have been admonished of its dangerous character, and doubtless would not have left it exposed. The fact that the mother was ignorant of the ingredients in the mixture is made clear by the fact that, when she discovered the child had swallowed it, she was not alarmed, and did not deem it necessary at once to call in a physician. If the bottle had been labeled poison, the mother, on discovering the child had taken it, would have immediately taken steps to counteract the deadly potion. Nor can the act of the child in getting down the mixture from the mantelpiece, and drinking it, be invoked as an intervening and independent juridical cause. The child was an irresponsible agent; it had not reached years of discretion, and negligence was not imputable to it. The case of *Meyer* v. *King*, 72 Miss. (S. C., 35 L. R. A., 474), cited by counsel for plaintiff in error, and other like cases, are easily distinguishable from this one, in the important feature that each presented an intervening, responsible agent that

broke the chain of causation, so that the death could not be concatenated with the breach of the statute.

It is insisted, however, that the statute requiring druggists to label all poisonous substances does not apply to every substance that contains any amount of poison, regardless of the purpose for which it was intended, and that it does not apply where the substance is furnished on the prescription of a physician which does not call for such a label. The statute is, viz.: "Any person who sells and delivers any poisonous liquid or substance without having the word ' poison ' written or printed on the label attached to the vial, box, or parcel in which the same is sold, shall, on conviction, be fined not less than twenty nor more than one hundred dollars." Shannon's Code, § 6745.

Does this statute apply to medicine containing any ingredient of poison, compounded upon the prescription of a physician, or is it to be limited in its operation to the sale of poisons in original form? It is in proof that a large proportion of medicines and druggists' compounds contain ingredients of poison, and it is argued that if all medicines containing poison, no matter how minute in quantity, must be labeled poison, nervous and excitable persons would refuse to take the remedy prescribed, for fear of the consequences, or, if taken, its therapeutic efficacy would be destroyed by the mental excitement and uneasiness thus aroused.

The question presented in respect of the proper

construction of this Act arose in the Common Pleas of Ohio on a similar statute. That Act provided that "whoever sells, or gives away, any poison, without first having marked the word poison upon the label or wrapper containing the same, . . . shall be fined," etc. The defendant in that case was a druggist, and was indicted for violating the statute in a sale of morphine, then and there contained in a certain bottle labeled "Mrs. Winslow's Soothing Syrup," without having the word poison on the label or wrapper containing said article. The Court said, viz.: "The construction given to this statute by the State, was that it prohibited the sale, without the label, "poison," of any quantity of morphine, whether the same was sold in a free state or in a mechanical mixture, or in the form of a proprietary medicine, or under prescription of a doctor, without regard to whether the mixture containing the poison was a medicine, or was poisonous or nonpoisonous."

"By the construction contended for, it would be impossible for the wit of man to conceive of the sale of any article belonging to the class usually denominated poison, in any quantity, however small, or in any sort of a mechanical combination, if unlabeled, without violating the statute. . . .

"The construction adopted by the Court below renders criminal millions of transactions that have occurred in Ohio during the past fifty years, and are occurring daily, for the prescription of every

physician, containing morphine or opium, or strych-nine or arsenic, that is given as a medicine and that is filled by the druggist, would have to be la-beled poison. If the mixture or medicine so sold contains so little of the poison the effects of which were beneficial and not injurious, the statute would still be violated. Every sale of many a remedy that has been in use for years would have to be stamped "poison." I instance Dover's powders and paregoric and syrup of ipecac. Others might be given. Is it possible that this statute is to be so construed that prescriptions of physicians and these ordinary remedies are to be labeled poisons? Clearly not.

"Wherever a statute admits of two constructions we are bound to presume that the Legislature intended to do that which is clear, manifest, and just. The presumption against absurdity in the provision of a legislative enactment is probably a more powerful guide in construction than the presumption against unreasonable inconvenience or injustice. The Legis-lature cannot be supposed to intend its own stultifi-cation. When, therefore, to follow the words of an Act leads to absurdity in its consequences, that constitutes sufficient authority to depart from them. Endlich, Interpretation of Statutes, Secs. 258-264.

"A construction leading to absurd consequences will be deemed not intended, and language will be restrained accordingly. 39 Ohio St., 651; 50 Ohio St., 661.

"The practical construction given to section 6957

for now nearly half a century has been directly contrary to the construction urged. Until this case was prosecuted no one ever thought that the law required the numerous prescriptions which druggists of Ohio have filled, containing morphine or other poisons, to be labeled as poisons, and a record to be kept, as required by this statute. It is a fact beyond dispute, that nearly one-third, at least fully one-fourth, of all the prescriptions given by physicians in Ohio contain poison, morphine and opium being common poisons prescribed. It is a fact, further, that these prescriptions, as a rule, contain more of such poisons, relatively, than the mixture sold by Marvin. There is scarcely a cough syrup prescribed by any physician which does not contain morphine or opium, or some other form of such poisons which is the equivalent of morphine, in an equal proportion or greater than that contained in this mixture. No one has ever construed this statute as prohibiting the sale of such mixtures as poisons. Dover's powders have been a well-known medicine and remedy for one hundred and fifty years. The dose of Dover's powder is from five to fifteen grains. If we take the middle dose, say ten grains, it is composed of one grain of opium, one grain of ipecac, eight grains of sugar of milk (U. S. Pharmacopœia, last edition). The United States Dispensatory gives one grain of opium ordinarily to be the equivalent of one-tenth of a grain of morphine. Therefore, a ten-grain Dover's powder contains exactly as much poison, the

equivalent of morphine, as an ounce of this mixture. The druggists of Ohio never construed this statute as requiring them to label Dover's powder a poison. Take another very common household remedy, paregoric. It is prescribed by the most eminent physicians. The pharmacopœia says that it is composed of opium, benzoic acid, camphor, oil of anise, alcohol, and glycerine. There are two grains of opium to every fluid ounce of the mixture. Therefore, every fluid ounce of paregoric contains the equivalent in poison of one-fifth of a grain of morphine, which is double the poison in an ounce of this soothing syrup. Has it ever been thought that the sale of paregoric by a citizen of Ohio, without labeling it poison, was a criminal act? Other instances could be given. These are all facts of common knowledge, and all proper for the Court to consider in giving construction to this statute. Courts will take judicial notice of facts of common knowledge. The conclusion reached is, that the statute in question is not a statute governing the sale of mixtures compounded as medicines, whether proprietary or prescribed by a physician, even though such medicines contain poisons in solution or in a free state.

"This is a statute regulating the sale of poisons, and it governs the ordinary and common transactions of people in the selling of poisons in Ohio, and does not apply to the selling of poison in harmless mechanical mixtures, or in proprietary mixtures that are beneficial medicines, or to poisons contained in

Wise & Co. *v.* Morgan.

medicines prescribed by physicians for the cure of disease. It is never permitted, it is intolerable, to create offenses by mere construction." 50 Pa. St., p. 207.

We have thus quoted at length from the foregoing opinion, not that it is authoritative or controlling, but for the manifest good sense it contains, and as illustrating the *reductio ad absurdum* if the literalism of the statute should be followed. We cannot assent to the construction of the statute given by the Circuit Judge, and hold that it does not apply to medicines compounded by druggists upon the prescriptions of physicians. In this view, there is no evidence to support the verdict of the jury. The judgment is therefore reversed, and the cause remanded.