AGRICULTURAL SERVICES ASSOCIA-
TION, INCORPORATED,
Plaintiff-Appellee,

v.

FERRY–MORSE SEED COMPANY, IN-
CORPORATED, Defendant-Appellant,

and

Waldo Rohnert Company, Third-Party
Appellant.

Nos. 75–2412 and 75–2413.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 15, 1976.

Decided March 25, 1977.

Rehearing Denied May 20, 1977.

John S. Porter, Charles O. McPherson, Burch, Porter & Johnson, Memphis, Tenn., for defendant-appellant in 75–2412.

Roy Hall, James D. Todd, Jackson, Tenn., James H. Kinnard, Lebanon, Tenn., for plaintiff-appellee in both cases.

Edward A. Kizer, Goff, Canale, Kizer & Cribbs, Memphis, Tenn., Spencer LeRoy, III, Chicago, Ill., for defendant-appellant in 75–2413.

Before WEICK, PECK and ENGEL, Circuit Judges.

WEICK, Circuit Judge.

The controversy in these appeals arose out of the sale of 25,000 pounds of Clemson Spineless Okra Seed [C/S] okra seed[1] in

---

1. "Okra" is defined in Webster's New International Dictionary 1695 (2d ed. unab. 1956) as a "tall annual (*Abelmoschus esculentus*) widely cultivated in the southern United States and

September, 1967 by Ferry-Morse Seed Company, Inc. [F–M], a California corporation, to Agricultural Services Association, Inc. [ASA], a Tennessee cooperative. F–M had purchased the seed from Waldo Rohnert Company [W–R], a California corporation. Because the seed was not C/S okra seed but was defective seed and had been mislabeled, in violation of law, ASA filed a suit for damages against F–M and W–R.[2] F–M counterclaimed for indemnity against W–R.

The District Court tried the case without a jury. In a Memorandum Opinion it adopted findings of fact and conclusions of law. It found a violation of The Federal Seed Act, 7 U.S.C. § 1551, *et seq.* by both W–R and F–M; that W–R breached its contract with F–M to deliver suitable and commercially acceptable and productive C/S variety okra seed; that F–M breached its contract with ASA to deliver suitable and commercially acceptable and productive C/S variety okra seed; that F–M breached and violated the provisions of T.C.A. §§ 43–1003 and 1007 with respect to mislabeling okra seed as C/S variety when in fact they were an "off brand" or another variety okra seed which F–M sold and distributed to ASA in five pound packages or containers in Tennessee; that F–M breached and violated the provisions of 7 U.S.C. §§ 1571(b) and (d) by mislabeling the okra seed which it sold and delivered to ASA in Tennessee by means of an interstate shipment, labeling the seed falsely as C/S variety when it was not, in fact, C/S variety; that W–R breached and violated the provisions of 7 U.S.C. §§ 1571(b) and (d) by mislabeling the okra seed which it sold and delivered to F–M for transport and/or delivery in an interstate shipment, labeling the seed falsely as C/S variety when it was not, in fact, C/S variety; that said mislabeling by both defendants violated California law; that both defendants breached an express warranty as well as an implied warranty of merchantability by mislabeling;

that they were both negligent as a matter of law for violating the federal seeds statute and the seeds statutes of California and Tennessee, and both were negligent in failing to do sufficient and proper testing of the seed; that the violations of the statutes and the breaches of contract and warranty and the negligence of the defendants were the proximate cause of damages sustained by ASA.

The Court entered judgment fixing liability of both F–M and W–R to ASA for those damages which may properly and proximately flow from the wrongs found to have been committed by them. It awarded judgment in favor of F–M against W–R for the purchase price of the seed plus freight charges which had been improperly and incorrectly labeled, and referred the case to its Magistrate as Special Master, to determine the amount of damages which ASA was entitled to recover. The parties then stipulated certain facts. The Magistrate conducted hearings and filed his report assessing damages, to which F–M and W–R filed exceptions.

The Court then overruled the exceptions and entered final judgment in favor of ASA against both F–M and W–R in the amount of $75,985.56, with interest at 6% from March 27, 1974, the date of its judgment fixing liability. It entered judgment in favor of ASA against F–M for $3,519.91 (plus interest), being the purchase price of the defective seed. It entered judgment in favor of F–M against W–R for $7,505.70 (plus interest), being the purchase price of the defective seed. It denied F–M recovery against W–R for indemnity and breach of express warranty claims. Both F–M and W–R have appealed.

We affirm as to the judgment for damages and for the purchase prices of the seeds, except as to the inclusion therein of $25,000 damages to the good will of ASA, which was not proven. We reverse as to

the West Indies for its mucilaginous green pods, used as the basis of soups, stews, etc., or made into pickles; also, the pod, or, collectively, the pods, of this plant."

2. The suit was filed in the Circuit Court of Crockett County, Tennessee, and was removed to the federal court.

the denial of indemnity and as to breach of express warranty claims of F–M against W–R.

ASA is a cooperative marketing association, organized in 1966 in Tennessee, and is located at Bells, Tennessee. It is composed of individual tenant farmers who belong to cooperative associations, and the cooperative associations form ASA. ASA was incorporated after it had purchased the assets and twenty-year business of Crockett Farms, Inc. The main business of ASA is procuring farmers to grow okra for sale to Wintergarden Freezer Company, part of the frozen food industry.

In September, 1967 James E. Cook, an F–M sales representative, solicited an order of 25,000 pounds of C/S okra seed from ASA. The order was made and set to be delivered in Tennessee, and F–M accepted it in California; however, F–M found itself 25,000 pounds short of C/S okra seed to fill the order, and therefore, it ordered the seed from W–R.

The 25,000 pounds of seed was sent by W–R to F–M in February, 1968. The seed came from Lot No. 3501–P–38; it was labeled true to type C/S okra seed. F–M packaged the seed in its own bags as Lot No. 91710, without notice to either W–R or ASA. Of this lot, 9,645 pounds were shipped in March, 1968 as a "drop shipment" to ASA [3] and the rest was shipped to General Foods Corporation. F–M had represented and warranted to ASA that the seed was either C/S okra seed or true to type C/S okra seed, when in fact the seed was an off variety. The seed produced only about one-half of the normal C/S okra plant, a substantial reduction from previous years' production. This low yield caused ASA and its growers to fail to meet their contractual obligations.

This was not the first time that F–M had purchased seed from W–R. In 1965 F–M received from W–R 37,000 pounds of Lot No. 3501–C–25; in 1966 12,000 pounds of Lot No. 3501–0–36; and in 1967 4,000 pounds of Lot No. 3501–X–39. These three lots were related to Lot No. 3501–P–38 and had apparently been sold to Crockett Farms without complaint.[4]

By simply examining the seeds themselves an expert could not determine whether the seed was true C/S variety. Despite this fact the Court found that W–R failed to conduct effective tests "to determine the geno-type or productive characteristics of its Lot 3501–P–38 or of the lots from which Lot 3501–P–38 was essentially derived." Essentially W–R neglected to make a direct comparison with other than the Rohnert source on the seed samples. Thus, W–R did not make an effective comparison test check on the seeds in Lot No. 3501–P–38 to determine whether they were true to type C/S okra seed. Nevertheless, W–R falsely labeled its seed C/S okra seed, on which label F–M relied when packaging this seed for ASA.

W–R knew that F–M intended to resell the seed, and both F–M and W–R "knew that the seed might be expected to be utilized in commercial farming operations such as that of ASA and its farmer-growers."

W–R had attached to each seed bag which it delivered to F–M a tag on which the following language was printed:

Notice to buyer: We warrant that seeds sold have been labeled as required under state and federal seed laws and that they conform to label description. We make no other or further warranty expressed or implied.

No liability hereunder shall be asserted unless the buyer or user reports to the warrantor within a reasonable period af-

---

**3.** ASA paid $3,809.78 for the seed and was later given credit for 745 pounds of returned seed, or $289.87.

**4.** F–M conducted grow-out tests on the four lots. In 1966 F–M found Lots Nos. 3501–0–36 and 3501–C–35 satisfactory lots for sales. On September 27, 1968 F–M noted that Lots Nos. 3501–X–39 and 3501–P–38 are "long, smooth and appear O.K." However, the District Court termed these tests as not effective or extensive, and found that F–M "had insufficient time in which independently to test the particular W–R Lot No. 3501–P–38 received in February, 1968, and shipped by it the next month to ASA."

ter discovery (not to exceed 30 days) any conditions that might lead to a complaint. Our liability on this warranty is limited in amount to the purchase price of the seed.

Because of past dealings between W–R and F–M and F–M's notice of the disclaimer, the District Court limited the amount of recovery to F–M from W–R, for the warranty violations, to the purchase price which F–M paid for the seed.

The Magistrate, acting as Special Master, conducted a hearing on the amount of damages. On March 24, 1975 he issued his findings. The Magistrate found the following damages were sustained by ASA from F–M and W–R as a result of the liability imposed by the Court:

| | |
|---|---|
| Interest paid on bad seed | $ 1,804.56 |
| Growers' claims assigned to plaintiff | 30,000.00 |
| Losses by buying stations assigning claims to plaintiffs | 8,648.00 |
| Loss of marketing fees on okra lost by those filing claims | 2,253.00 |
| Other lost marketing fees of ASA | 8,280.00 |
| Loss of business and good will | 25,000.00 |
| Total | $75,985.56 |

The interest was the amount paid to F–M by ASA on the purchase price for the defective seed. The assigned claims to ASA of the growers and buying stations had been stipulated by the parties. The loss of marketing fees to ASA on okra, lost by the assignors, had also been stipulated by the parties. The other lost marketing fees and the loss of business and goodwill were arrived at by estimations.

The $8,280 figure was calculated in the following manner: Mr. David M. Pearson, an agricultural expert, approximated the total loss of marketing fees from all growers as $10,533. The Magistrate subtracted $2,253, stipulated loss from the assignors, from the $10,533, to arrive at $8,280.

The Magistrate found that $25,000 was a reasonable amount of damages for the loss in ASA's goodwill resulting from the bad seed. The approximate loss of $140,000 to the two thousand to three thousand growers who used the defective seed, the harm to ASA's standing in the financial community, and the emphasis ASA placed on okra

in its business with the growers, all were elements that entered into the Magistrate's calculations.

I

## CONFLICT OF LAWS

■ In this diversity case the Federal Court must apply state substantive law, *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and the conflict of laws of the forum in which it sits. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), and *Telecommunications, Eng'r Sales & Serv. Co. v. Southern Tel. Supply Co.*, 518 F.2d 392, 394 (6th Cir. 1975). In the present case the forum state is Tennessee and the parties do not dispute which state conflict of laws applies.

■ The F–M/W–R contract was entered into and accepted within California. In fact all contacts between these two parties touch only that state; thus, the law of California applies to the F–M/W–R contract.

■ As to the ASA/F–M contract the circumstances surrounding the contract lead to the conclusion that Tennessee law applies. The only California contact with this contract was that F–M, a California corporation, accepted the contract in California; otherwise, the place of negotiations, the signing of the order by ASA, the place of performance, and the place of the breach, all occurred in Tennessee.

[A] contract is presumed to be made with reference to the law of the place where it was entered into unless it appears that it was entered into in good faith with reference to the law of some other state. [*Deaton v. Vise*, 186 Tenn. 364, 372, 210 S.W.2d 665, 668 (1948)].

Accord: *MacPherson v. MacPherson*, 496 F.2d 258, 261 (6th Cir. 1974); *Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, Tenn., 493 S.W.2d 465, 467 (1973), and *First Am. Nat'l Bank of Nashville v. Auto Ins. Co.*, 252 F.2d 62, 64 (6th Cir. 1958).

In *Edington v. Edington*, 179 Tenn. 83, 92, 162 S.W.2d 1082, 1086 (1942), the Court,

quoting approvingly from *Hall v. Cordell*, 142 U.S. 116, 120, 12 S.Ct. 154, 35 L.Ed. 956 (1891),[5] said:

> But where there is nothing to show that the parties had in view, in respect to the execution of the contract, any other law than the law of the place of performance, that law must determine the rights of the parties.

The evidence clearly indicates that the parties intended Tennessee law to apply to the contract. *Compare* Restatement (Second) of Conflict of Laws § 188 (1971), and *American Training Services v. Commerce Union Bank*, 415 F.Supp. 1101, 1104 n. 3 (N.D.Tenn.1976).

■ As to any wrong suffered by ASA, Tennessee adheres to the place of the wrong, namely Tennessee, where the defective seed was delivered, distributed, and planted. In our opinion the law of Tennessee governs as to the rights of ASA against both F–M and W–R. *Telecommunications, Eng'r Sales & Serv. Co. v. Southern Tel. Supply Co., supra*; and *Koehler v. Cummings*, 380 F.Supp. 1294, 1305 (M.D.Tenn. 1974).

## II

### WARRANTIES

#### A. EXPRESS WARRANTY

■ W–R expressly warranted to F–M that the seeds in question were C/S okra seed. F–M in turn, relying on W–R's representations, also expressly warranted to ASA that the seeds were C/S okra seed. In fact the seeds were not C/S okra seed but were an off variety. ASA in turn, relying on F–M's representations, distributed the seed to its growers, erroneously believing that the seed was C/S okra seed. Thus, both W–R and F–M violated their express warranties under the law of California as well as under the law of Tennessee. Cal. Com.Code § 2313(1)(a) and (b) [W–R] and Tenn.Code Ann. § 47–2–313(1)(a) and (b) [F–M].

However, W–R argues that the seeds in Lot No. 3501–P–38 from prior F–M orders to W–R, were in fact samples for the order in question that were made a basis of the bargain. W–R claims that it filled the order in question by conforming the samples to the okra seed, thus meeting the expressed warranty that it made to F–M. It claims that at a minimum, the seeds conformed to the prior similar okra seeds' descriptions which seeds it had sold to F–M.

■ Sale by description or sample, however, requires that the seed conform to the description or the sample. Herein, W–R described the seed as C/S okra seed in its written warranty but instead the seed was not C/S okra seed but was an off variety. No sample from Lot No. 3501–P–38 was ever made a basis of the bargain. In fact, no effective tests on the seed were ever conducted by either F–M or W–R. In order for past descriptions or samples to become part of the bargain, both parties must mutually agree to the arrangement and the descriptions or samples must conform to the understanding. 67 Am.Jur.2d *Sales* § 456 (1973). W–R has pointed to no such mutual understanding; rather, the manager of F–M testified that it purchased the seed in question from W–R because of the "good experience" it had in the past with the C/S okra seed, not because of past descriptions or samples.

#### B. IMPLIED WARRANTIES

F–M does not contest the District Court's findings that it violated its implied warranties of merchantability or fitness for particular purpose to ASA.

■ W–R claims, however, that it is not liable to F–M for breach of an implied warranty of merchantability because F–M's prior testing of the C/S okra seed amounted to an inspection of the seed which ought to have revealed any defects. We disagree.

As noted above, arguments concerning prior samples are inapposite. Any prior

---

**5.** Although the Tennessee Supreme Court states that this quote is from the *Hall* case, it is apparently only a paraphrase from the case.

tests conducted by W–R or F–M on the C/S okra seed were inadequate because of failure to check the seed with outside sources. It was not surprising therefore that these tests did not reveal any defects. Furthermore, the test took approximately three months of growth before any conclusions on the plant samples could be made. Since F–M had only one month to deliver the seed to ASA, it had no time to test effectively the quality of W–R's seed from Lot No. 3501–P–38.

W–R has not pointed to any place in the record to show that it ever demanded that F–M inspect the seeds and that F–M refused. See Cal.Com.Code § 2316, U.C.C. comment 8 and Cal.Code comment 4.

ASA does not contest the District Court's finding that no implied warranties from W–R to ASA existed because of the lack of privity between the parties. Initially the District Court found that W–R had breached an implied warranty of fitness because it had mislabeled the seeds. The privity issue focused on Tennessee law at the time of the wrong, which law has since been changed. See Tenn.Code Ann. § 23–3004.

W–R also argues that it is not liable to F–M for breach of an implied warranty of fitness for particular purpose because F–M neither informed W–R of any particular purpose in ordering the seed nor told W–R about the resale of the seed to ASA. W–R claims that F–M relied on its own skill or judgment in ordering the seed, rather than on the seller's (W–R's) skill or judgment. We disagree.

■ Whether W–R made an implied warranty of fitness for particular purpose to F–M, is determined by the facts and circumstances of the contracting negotiations. As noted in U.C.C. comment 1 of the Cal.Com.Code § 2315:

> Under this section the buyer need not bring home to the seller actual knowledge of the particular purpose for which the goods are intended or of his reliance on the seller's skill and judgment, if the circumstances are such that the seller has reason to realize the purpose intended or that the reliance exists. The buyer, of course, must actually be relying on the seller.

■ "The essential requisites of this 'implied warranty of fitness' are that the seller be apprised of the intended use of the product and that the buyer rely upon the skill and know-how of the seller in his selection of the product." *Odell v. Frueh*, 146 Cal.App.2d 504, 509, 304 P.2d 45, 49 (1956). The buyer must intend to use the goods for a particular purpose, and the seller at the time of contracting must have reason to know both of this particular purpose and that the buyer is relying on his skill or judgment. *Metowski v. Traid Corp.*, 28 Cal.App.3d 332, 341, 104 Cal.Rptr. 599 (1972).

In the present case W–R knew at the time of contracting that F–M intended to resell the seed. An order of 25,000 pounds of okra to F–M's Mt. View, California plant was indicia of this fact. In fact W–R in the past knew that its okra was used to produce commercial crops. However, W–R falsely labeled the seed as C/S okra even though it was an off variety. W–R's mislabeling led F–M to believe mistakenly that the seed was indeed the C/S okra variety. F–M had no time to check the particular quality of the seed because ASA requested delivery of the seed in March or early April. F–M had no choice but to rely on W–R's skill in producing the proper C/S okra seed. Furthermore, F–M relied on W–R's skill in providing the proper seed. Evidence of this reliance is found in F–M's reliance on the level of germination. F–M originally requested that the germination of the seed be 85%. Instead, F–M accepted a lower level of germination of 76%. Only W–R's knowledge of the capability of the seeds could reasonably account for this change in the level of germination. As noted above, F–M did not purchase C/S okra seed from W–R because of F–M's conclusions or judgments from the prior testing of the parent seeds, but because of the previous good experience with the C/S okra seed.

## C. LIMITATION ON LIABILITY

Despite W–R's breach of expressed and implied warranties, the District Court limit-

ed W–R's liability to F–M to the purchase price of the seed because of the language on the tags attached to each seed bag. The District Court noted that the language on the tags was no surprise to F–M because their past dealings and the customs and usages of the industry utilized similar limitations.

F–M argues that the limitation on the tags could not modify W–R's implied warranty of merchantability because the tags did not contain the word "merchantability" as required by Cal.Com.Code § 2316(2); that Cal.Com.Code § 2316(3)(c) on modification through past dealings or course of performance or usage of trade refer only to modifications of implied warranties, not express warranties; that Cal.Com.Code § 2316 refers only to modification of warranties, not a limit on all remedies; that in light of the judgment for $75,985.56 damages, a maximum limitation of $7,505 liability for W–R to F–M is unreasonable; and that Cal.Civ.Code § 1668 prohibits W–R's contract limitation as against public policy.

▇▇▇ Notwithstanding the necessity of inclusion of the word "merchantability" as a prerequisite to exclude or modify an implied warranty of merchantability (Cal. Com.Code § 2316(2)), Cal.Com.Code § 2316(3)(c) provides for exclusion or modification "by course of dealing or course of performance or usage of trade." In fact an implied warranty of fitness can be excluded or modified in a similar manner as well as by written and conspicuous language of limitation. (Cal.Com.Code § 2316(2)). In the present case F–M admitted that similar language of limitation had been used in the past by W–R in its dealings with F–M. Even F–M itself had used similar language of limitation on its own seeds. Thus, the District Court did not err in finding that prior course of dealings and the usage of the trade modified W–R's implied warranties to F–M by the tags.

▇▇▇ However, as to modification of the express warranty that the seed was C/S

okra seed, Cal.Com.Code § 2316 requires that the creation of an express warranty be construed consistently with its limitation. In the present case W–R expressly warranted on the tags that the seeds had been labeled in accordance with state and federal seed laws and "that they [the seeds] conform to label description."

In *Grinnell v. Charles Pfizer & Co.*, 274 Cal.App.2d 424, 440, 79 Cal.Rptr. 369, 378 (1969), the Court stated:

"An 'express warranty' means simply an undertaking or covenant that the thing which is the subject of the contract is or is not of a certain quality or capacity." (*Yuba Mfg. Co. v. Stone*, 39 Cal. App. 440, 444, 179 P. 418, 420.) The essential ingredients of an express warranty are that there must be an affirmation of fact by the seller with reference to the thing sold, rather than a mere expression of the seller's opinion, belief, judgment or estimate, and that there be a reliance on such affirmation by the purchaser of the thing sold. [citations omitted].[6]

Accord: *Burr v. Sherwin Williams Co.*, 42 Cal.2d 682, 696, 268 P.2d 1041 (1954).

▇▇▇ The seed was not C/S okra seed but was an off variety. Clearly W–R breached its express warranty to F–M that the seed labeled as C/S okra seed was really that seed. F–M relied on the label in repackaging the seeds and selling them to ASA. The language on the tags, however, undertook to limit W–R's liability for breaches of warranties to the purchase price of the seed. Nevertheless, Cal.Civ. Code § 1668 prohibits contracts or agreements which exempt a party from the responsibility of the consequences of one's negligent violation of the law as against public policy, *Halliday v. Greene*, 244 Cal. App.2d 482, 488, 53 Cal.Rptr. 267 (1966), or from one's fraud. "Civil Code section 1668 makes the statement of limitation of liability void as against public policy." *Klein v. Asgrow Seed Co.*, 246 Cal.App.2d 87, 101, 54

---

**6.** In *Hauter v. Zogarts*, 14 Cal.3d 104, 115–17, 120 Cal.Rptr. 681, 534 P.2d 377 (1975), the California Supreme Court implied that the re-liance requirement in *Grinnell* was in error, citing UCC comment 3 of § 2313. It declined to resolve the issue.

Cal.Rptr. 609, 618 (1966) (Manufacturer-supplier of seed knowingly and deliberately misrepresented that the seed sold was true to type seed, when in fact it was an off type. The limitation of liability to the purchase price of the seed was invalid.).

Cal.Civ.Code § 1668 states:

All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law.

The Uniform Commercial Code has not diminished the force of § 1668. In dicta from *Klein v. Asgrow Seed Co., supra*, at 102, 54 Cal.Rptr. at 619, the California Court of Appeal said:

It is urged that the newly-adopted Uniform Commercial Code negates liability in a seed manufacturer under the facts of this case. Since the Commercial Code is inapplicable to these sales, we might avoid answering that argument. As we view it, however, the Commercial Code does not curtail, in any respect we have noted, liability imposed by its predecessor (the Uniform Sales Act) upon sellers for breaches of warranty nor extend their power to disclaim or limit liability for such breaches. The Commercial Code neither expressly nor impliedly repeals Civil Code, section 1668 . . . . [footnote omitted].

■ W–R erred in labeling the seed bags as C/S okra seed, albeit negligently, even though the seed was an off variety. In so mislabeling the seed, W–R violated the California Seed Law, Cal.Agric.Code § 52251 *et seq.* As stated in *Klein v. Asgrow Seed Co., supra*, at 100, 54 Cal.Rptr. at 618:

Civil Code section 1668 is buttressed by another statement of legislative policy. Agricultural Code section 914 [new section 52482] provides in part: "It is unlawful to ship, deliver, transport, or sell any agricultural or vegetable seed within this State: . . . (4) Having a false or misleading labeling, or pertaining to

which there has been a false or misleading advertisement."

The statute was "intended for the benefit of purchasers of seed," *id.*, like F–M. See also 7 U.S.C. § 1551 *et seq.*

■ W–R may not use tags under California law to limit its own liability for its own failure to properly label the purchased items. It is manifestly unfair to hold F–M's limit for recovery from W–R to the purchase price, for errors which were caused solely by W–R. W–R should be held liable for its own wrongs which caused the damage to ASA and F–M. See *Halliday v. Greene, supra* (landlord's exculpatory clause as to injuries ineffective against violation of safety order in light of § 1668); *Hanna v. Lederman*, 223 Cal.App.2d 786, 792, 36 Cal.Rptr. 150 (1963) (exculpatory provision for damage to goods in lease not a defense to a negligence cause of action based on municipal code violations, in light of § 1668); and *Wilson v. Rigali & Visilich*, 138 Cal.App. 760, 765–66, 33 P.2d 455 (1934) (vendor's provision expressly waiving all promises and understandings not specified in contract void per § 1668 because one cannot escape liability for one's own fraud).

### III

### NEGLIGENCE

■ The District Court found both F–M and W–R were negligent in tort law to ASA for violating the California, Tennessee and Federal Seed Acts and for mislabeling. Further, both defendants failed to conduct effective and sufficient tests on the seed. Privity is not required for negligent actions sounding in tort.

F–M does not contest these findings. W–R on the other hand, contends that F–M was contributorily negligent for failure to adequately test the okra seed in question. W–R also complains that it is unfair to find it guilty of violating various seed laws, forming a basis for negligence *per se*, when it has never been charged with violation of these laws. Furthermore, W–R claims that it did not commit ordinary negligence. W–R argues that it owed no duty of care to ASA; that ASA's injury was not reason-

ably foreseeable; and that W–R could not have anticipated F–M's negligence.

The Tennessee Supreme Court in *Alex v. Armstrong*, 215 Tenn. 276, 283, 385 S.W.2d 110, 114 (1964), applied the negligence *per se* doctrine:

> The rules in Tennessee relating to liability for the violation of a statute have been stated as follows:
>
> "It is well settled that a failure to perform a statutory duty is negligence per se, and, if the injury is the proximate result or consequence of the negligent act, there is liability." *Wise & Co. v. Morgan*, 101 Tenn. 273, 278, 48 S.W. 971, 44 L.R.A. 548.
>
> "It has long been well settled in this State that a violation of a statute which causes injury to one within the protection of the statute is negligence per se and actionable." (citing numerous cases) *Null v. Elec. Power Board of Nashville*, 30 Tenn.App. 696, 707, 210 S.W.2d 490, 494.
>
> "In the order to found an action on the violation of a statute, or ordinance, * * * the person suing must be such a person as is within the protection of the law and intended to be benefited thereby * * * We think that one not a beneficiary of a statute may neither base an action nor a defense on a violation thereof."
>
> *Carter v. Redmond*, 142 Tenn. 258, 263, 218 S.W. 217, 218.

In *Mitchell v. Ketner*, 54 Tenn.App. 656, 660, 393 S.W.2d 755, 757 (1964), the Court stated:

> . . . [V]iolation of a penal statute is negligence *per se* and will sustain an action for civil wrong, but only if it affirmatively appears that such violation was the proximate cause of the injury.

In *Biven v. Southern Oil Service, Inc.*, 54 Tenn.App. 678, 687–88, 394 S.W.2d 141, 145 (1965), the Court stated:

> [S]uch negligence has always been treated as being on the same plane with simple common law negligence, unless of course the violation was willful, or purposeful, or wanton, or in so reckless a manner as to indicate this attitude of mind.

As to W–R's negligence to ASA, the relevant seed laws are Cal.Agric.Code § 52251 *et seq.*, Tenn.Code Ann. § 43–1001 *et seq.* [now § 43–921 *et seq.*] and 7 U.S.C. § 1551 *et seq.* These statutes prohibit false labeling of seed packages. Clearly these statutes are meant to protect such buyers as F–M and such consumers as ASA against purchasing the wrong seed. Further as a result of W–R's mislabeling the seed as C/S okra seed, F–M sold the seed to ASA, causing the tortious wrong complained of here. Thus, W–R was negligent in its labeling of the packages as C/S okra seed, causing injury to ASA.

Furthermore F–M was not contributorily negligent for failure to test the seed itself. First, F–M had no time actually to test the seed from the time of W–R's delivery of the seed to the time ASA received the seed for planting. Second, the negligence of W–R concerns mislabeling, not negligent failure to test seed properly. Third, under the circumstances of the need for delivery of the seed to ASA, and given F–M's past good experiences with W–R, F–M had the right to and did rely on W–R's representations as to the variety of the seeds.

## IV

## STRICT TORT LIABILITY

F–M does not contest the District Court's finding that it was strictly liable to ASA for misrepresentation that the seed was C/S okra seed; however, W–R claims that the District Court erred in holding it strictly liable to ASA for tortious misrepresentations. Because we have already held W–R liable to ASA on the ground of negligence, we need not reach this issue.

## V

## DAMAGES

### A. INTEREST

Tenn.Code Ann. § 47–14–107 provides in part that liquidated and settled accounts

signed by the debtor "shall bear interest from the time they become due."

In *Draper v. Great American Ins. Co.*, 224 Tenn. 552, 561–62, 458 S.W.2d 428, 432 (1970), the Court stated:

This statutory enactment however, limits application for the recovery of interest to obligations which are liquidated or settled, and obligations where the amount can be determined by mere computation at commencement of the action. ˙ [Citations omitted]

In *Air Temperature, Inc. v. Morris*, 63 Tenn.App. 90, 109–10, 469 S.W.2d 495, 504 (1970), the Court stated:

An account is liquidated and settled when the amount due is fixed by law, or has been ascertained and agreed upon by the parties.

■ In the present case ASA paid F–M interest on the $3,515.50 purchase price of the seed from Lot No. 91710. The Magistrate determined the amount of interest paid to be $1,804.56. The figure was calculated by using a 7% rate prior to April 1, 1969 and a 9% rate after that date, interest charged ASA by F–M. This figure has never been in doubt and clearly is a liquidated account. The award was proper.

■ W–R complains that the awarding of interest was error because ASA did not plead these damages in its complaint. The short answer to this claim is that Fed.R. Civ.P. 15(b) allows for amendment of the pleadings to conform to the evidence. ASA's failure to amend its pleadings does not affect the resolution of this issue, *Hasselbrink v. Speelman*, 246 F.2d 34, 39 (6th Cir. 1957), especially where W–R has not pointed to any objection on the issue. *Shelley v. Union Oil Co. of Cal.*, 203 F.2d 808, 809, 14 Alaska 287 (1953).

■ W–R also argues that the interest arose from the F–M/ASA contract with which W–R had no connection. However, the delivery of the defective seed by F–M to ASA was the direct result of W–R's negligence. Regardless of W–R's errors as to the seed, the issue of ultimate responsi-bility will be treated under section VI herein on Indemnity.

Neither party contests seriously the awarding of damages of $30,000 growers' claims assigned to ASA, the $8,648 losses by buying stations' assigned claims to ASA, or the $2,253 loss of marketing fees to ASA on okra lost by those who assigned their claims to ASA.

## B. OTHER LOST MARKETING FEES OF ASA

Both F–M and W–R contest the awarding of $8,280 to ASA for the lost marketing fees on the non-assignor growers. Both F–M and W–R note that the record is silent on whether these growers suffered any losses. In fact there was no evidence that these growers actually planted the defective seed. F–M and W–R do not contest that ASA could recover these damages, but rather dispute whether the damages have been proven.

The Magistrate used estimates on the amount of okra produced from both good and bad seed, and multiplied the difference by the estimated amount of seed distributed to all growers to arrive at the estimated lost amount of okra due to the defective seed. This figure was multiplied by the gross sales price of okra, which figure was then multiplied by the marketing fee to arrive at the estimated total marketing fee loss suffered by ASA, $10,533. The Magistrate subtracted from $10,533 the agreed-upon $2,253 lost marketing fees to arrive at the disputed $8,280 figure. We do not quarrel with the method of computation.

■ The record is silent as to any evidence that these growers actually produced the off variety okra and suffered resulting losses. There was testimony on losses from growers who had assigned their claims to ASA. There also was expert testimony as to the estimated losses sustained by the non-assignor growers. In our opinion the evidence was sufficient to support the calculations made by the Magistrate, which calculations were approved by the District Court.

## C. LOSS OF GOOD WILL

F–M and W–R argue that the District Court's award of $25,000 damages to ASA for loss of good will was error. Initially it must be recalled that ASA purchased its business from Crockett Farms in 1966. The purchase price included Crockett's goodwill but the amount for goodwill was not specified. ASA offered no evidence as to the purchase price of the goodwill nor the current book value of its goodwill. No officer of ASA testified as to the extent of damage to the goodwill of the corporation. W–R claims that the $25,000 figure was arrived at in an arbitrary manner, in effect, taken out of thin air. Both F–M and W–R argue that the $25,000 award was specious in light of ASA's entering the business world just when the okra controversy occurred. In fact W–R notes that the Magistrate's finding adopted by the District Court, was conjectural, incompetent and speculative in nature.

The burden of proving the loss of goodwill, W–R argues, is upon ASA. Factors to be considered in determining the loss of goodwill are the following: the length of time the business has been in existence; its average profits; its success; and the likelihood of its continuing business under the same name. Because ASA had been in business for only one year, had not shown a profit, and had placed great emphasis on okra for its success, ASA had not suffered $25,000 loss of goodwill. Despite ASA's problems, it has not lost the growers' confidence, F–M and W–R argue.

Lastly, W–R maintains that the Magistrate had authority only to make findings as to the extent of damages suffered by ASA, not the elements of damage. By determining that ASA suffered a grievous loss to its business and goodwill, the Magistrate overstepped his judicial authority and his findings are clearly erroneous under Fed.R.Civ.P. 53(e)(2).

After the District Court made findings of fact and conclusions of law, the case was "referred to the Master for the purpose of determining the amount of damages" which ASA was entitled to recover. The District Court ruled that ASA was entitled to recover damages "which may properly and proximately flow from the wrongs found to have been committed" by F–M and W–R.

During the hearing before the Special Master, United States Magistrate Aaron Brown, Jr., testimony was developed concerning the nature and set-up of ASA's business. Basically, ASA took over Crockett Farms in 1966. The employees of ASA then embarked on an ambitious program to explain to Western Tennessee farmers the cooperative farming system and the farmers' relation to the cooperatives. Through this set-up ASA channeled to the farmers through its employees its agricultural expertise on various farming techniques. On the whole ASA's efforts could be termed a success, as 5,000 individual growers joined ASA.

In order for ASA to succeed in its farming efforts, financing was needed to purchase harvesting equipment and to buy stations. A successful first year crop was needed to obtain unguaranteed financing. Previously ASA relied on Wintergarden Freezer Company's goodwill in obtaining a $1.5 million loan.

ASA contends, however, that the bad seed from F–M harmed its early business efforts in two ways: first, growers' confidence in ASA's expertise was diminished; and second, ASA's ability to obtain financing on its own, was hindered. In fact, some growers testified that they would not again attempt to grow okra.

The Magistrate in fixing the $25,000 damage to ASA's loss of business and goodwill, considered the following factors: (1) the number of growers producing okra for ASA, at least 2,000 farmers; (2) 64% of ASA's employee expenses went to the okra program; (3) ASA obtained a $1.5 million loan to finance its operations through the auspices of Wintergarden; (4) the stipulated loss to the assignor growers caused by the defective seed, was $30,000; and (5) the estimated loss to all growers, caused by the defective seed, was $140,000. The Magistrate did not consider any losses related to

the 1969 okra crop because that okra was not purchased from F–M.

The power and authority of a Master is dependent upon the District Court's order of reference. Fed.R.Civ.P. 53(c). If the Master's exercise of power is valid, his findings of fact in a non-jury action shall be accepted by the District Court unless clearly erroneous. Fed.R.Civ.P. 53(e)(2).

In *United States v. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), the Court stated:

A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

In the present case the Master acted within the District Court's order of reference in determining what the amount of damages to ASA, proximately caused by W–R's wrong, included loss of business and goodwill. Such damages were consequential damages from ASA's distribution of the bad seed. Whether the damages suffered to goodwill were $25,000, however, is another matter.

Defining that which constitutes "goodwill" is not easy. In *Bradford v. Montgomery Furniture Co.*, 115 Tenn. 610, 629–630, 92 S.W. 1104, 1109 (1905), the Tennessee Supreme Court said:

The good will of a firm is a species of property, often very valuable and it may be sold and transferred. It is defined by Judge Story as follows: "This good will may be properly enough described to be the advantage or benefit which is acquired by an establishment beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it received from constant and habitual customers, on account of its local position or common celebrity or reputation for skill, or affluence or punctuality, or from other accidental circumstances or necessities, or even from ancient partiality or prejudices." Story on Part., sec. 99.

Again in *Fine v. Lawless*, 139 Tenn. 160, 165–66, 201 S.W. 160, 161 (1917), the Tennessee Supreme Court noted:

The doctrine of "good will" has proven to be so salutary in effecting just results that it has been constantly expanding with the result that the definition of the word itself has been broadened as the doctrine has developed. This was noted in *Slack v Suddoth*, 102 Tenn., 375, 52 S.W. 180, 45 L.R.A., 589, 73 Am.St.Rep. 881, where it was said:

"It is difficult to define what 'good will' is. Lord Eldon said that it was simply 'the possibility that the old customers will resort to the old place.' *Crutwell v. Lye*, 17 Vesey, 335; *Moreau v. Edwards*, 2 Tenn.Ch. 349. But in *Christian v. Douglass*, Johns.Eng.Ch. 174, it was said that this was too narrow a view to take of it, and there it was said that it was every positive advantage acquired, arising out of the business of the old firm, whether connected with the premises where it was carried on, with the name of the late firm, or with any other matter carrying with it the benefit of the business of the old firm."

More recently in *Young v. Cooper*, 30 Tenn.App. 55, 74, 203 S.W.2d 376, 384 (1947), the Tennessee Court of Appeals said:

The good will of a business is the reasonable expectation of its continued profitable operation. Many factors are involved: the name of the firm, its reputation for doing business, the location, the number and character of its customers, the former success of the business, and many other elements which would be advantageous in the operation of the business. Good will is a property right which may be sold. *Piggly-Wiggly Corporation v. Saunders*, 6 Cir., 1 F.(2d) 572.

Other elements of goodwill include the length of time the business has been in existence; "its average profits; and the probability of its continuance under the same name." 38 Am.Jur.2d *Good Will* § 25 (1968). Of course each loss of goodwill must be considered in light of the facts and circumstances of the case.

We are well aware of the difficulty in ascertaining damage to goodwill. Often the evidence available to determine the damage is intangible, non-quantifiable. On the other hand, damages are not permitted which are remote and speculative in nature. *Summers v. Sanderson*, 7 Tenn. App. 624, 628 (1928); and *Donnelly v. Jackson Brothers*, 2 Hig. 408, 415 (Civ.App.Tenn. 1911). A plaintiff "must present 'data from which the amount of probable loss could be ascertained as a matter of reasonable inference'." *Cecil Corley Motor Co. v. General Motors Corp.*, 380 F.Supp. 819, 854 (M.D. Tenn.1974), quoting from *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1925). To set a quantifiable damage figure arbitrarily is impermissible. It would not be a "reasonable inference" but would be pure guesswork.

In the present case we are of the opinion that the Magistrate's findings with respect to goodwill, approved by the District Court, are not supported by substantial evidence and are clearly erroneous. When the okra crop failed, ASA was in business scarcely more than a year. Although many farmers participated in the cooperative okra project, often at the insistence of ASA and fellow growers, their loss of confidence in growing okra did not necessarily translate in loss of confidence in ASA. The testimony at the trial clearly demonstrated the fact that ASA was entirely innocent of the 1968 okra crop failure. The fault rested ·elsewhere. Even though some assigned growers at the damage hearing testified that they had lost confidence in okra, others have never quit growing the plant, or have recently replanted the seed. Further, any lack of confidence of growers in ASA could with equal propriety have resulted from the 1969 okra crop failure which involved okra seed not purchased by ASA from F–M. Thus, because growers lost profits in 1968 from the bad seed and ASA lost marketing fees, does not necessarily mean that ASA's goodwill suffered. The record is barren of evidence of growers becoming disillusioned with ASA.

Likewise, bare allegations that ASA was harmed in the financial community are insufficient. Testimony was lacking on which financial institutions denied ASA credit and if so when, and if they required more security of ASA on account of the 1968 okra set-backs. In short, ASA has not proven any nexus between the losses attributed to the defective seed and any loss of business and goodwill.

## VI

### INDEMNITY

F–M contends that it is entitled to indemnification from W–R for any liability to ASA. F–M argues that it was not guilty of any wrongdoing, but merely relied on the misrepresentations of W–R, on whose shoulders all fault rests.

In *Rossmoor Sanitation, Inc. v. Pylon, Inc.*, 13 Cal.3d 622, 628, 119 Cal.Rptr. 449, 452, 532 P.2d 97, 100 (1975), the Court said:

Indemnity may be defined as the obligation resting on one party to make good a loss or damage another party has incurred. This obligation may be expressly provided for by contract, it may be implied from a contract not specifically mentioning indemnity, or it may arise from the equities of particular circumstances. [Citations omitted]

In *Aetna Life & Cas. Co. v. Ford Motor Co.*, 50 Cal.App.3d 49, 52, 122 Cal.Rptr. 852, 854 (1975), the Court stated:

[Indemnity] applies in cases in which one party pays a debt for which another is primarily liable and which in equity and good conscience should have been paid by the latter party.

The Court further states (at 53, 122 Cal. Rptr. at 854):

The ultimate determination of whether or not indemnity should be allowed depends upon the circumstances of each case.

The Court, in *Taggart v. California*, 45 Cal.App.3d 768, 770–71, 119 Cal.Rptr. 696 (1975), quoting from *General Elect. Co. v. Cal. ex rel. Dept. Pub. Wks.*, 32 Cal.App.3d 918, 922, 108 Cal.Rptr. 543, 545 (1973), which quoted from *Atchison, T. & S.F. Ry.*

*v. Lan Franco*, 267 Cal.App.2d 881, 886–87, 73 Cal.Rptr. 660 (1968), said:

" '[T]wo critical prerequisites are generally necessary for the invocation of non-contractual implied indemnity in California: (1) The damages which the claimant seeks to shift are imposed upon him as a result of some legal obligation to the injured party; and (2) it must appear that the claimant *did not actively nor affirmatively participate* in the wrong.'

"The foregoing rule that one seeking equitable indemnity from his joint tortfeasor must not have *actively* or *affirmatively* participated in the wrong, has been widely followed in California." [Citations]

Thus, an automobile insurance company in an indemnity suit was permitted to show that it had been secondarily liable to the victim and that the automobile manufacturer was primarily liable. *Aetna Life & Cas. Co. v. Ford Motor Co., supra.*

■ The lessor of a crane who was neither negligent nor had knowledge of the defective crane, had "a right of implied indemnity against the persons primarily or actively at fault." *Green v. City of Los Angeles*, 40 Cal.App.3d 819, 838, 115 Cal. Rptr. 685, 698 (1974).

■ The difference between primary and secondary liability focuses on the type of the wrong rather than one of degree of negligence or comparative negligence. *Bill Loeper Ford v. Hites*, 47 Cal.App.3d 828, 832, 121 Cal.Rptr. 131 (1975).

■ Of course in an indemnity suit the party claiming a passive role must prove "its own lack of active negligence." *Aetna Life & Cas. Co. v. Ford Motor Co., supra* at 55, 122 Cal.Rptr. at 855.

■ In the present case F–M's wrongdoing could relate only to its reliance on W–R's representations as to the seed. The only claim of negligence made against F–M was its failure to conduct sufficient and effective tests on the seed delivered to it by W–R. However, with the needed delivery of the seed by F–M to ASA, F–M had no opportunity to conduct any effective tests prior to delivery.

The active role in the wrongdoing was played by W–R. F–M merely acted as a conduit in delivering the seed to ASA. This was conclusively shown in the District Court. It would be unfair to hold F–M liable for any wrongdoing when ultimate responsibility rests with W–R. Thus, F–M is entitled to full indemnity from W–R for its liability to ASA.

It is therefore ordered that the judgment of the District Court in favor of ASA against F–M and W–R, for damages, be reduced by the elimination therefrom of the item of $25,000 for damages to goodwill; that its denial ·of indemnity and breach of express warranty claims to F–M from W–R be reversed, and in all other respects the judgment of the District Court is affirmed. This cause is remanded to the District Court with instructions to enter judgment in favor of F–M against W–R for the entire amount of the judgment for damages entered in favor of ASA and against F–M and W–R, and for compliance with this opinion.