# NULL v. ELECTRIC POWER BOARD OF CITY OF NASHVILLE.—210 S. W. (2d) 492.

Middle Section.    January 26, 1948.

Petition for Certiorari denied by Supreme Court, May 3, 1948.

698

Jack Norman and Louis Farrell, Jr., both of Nashville, for plaintiff.

T. O. Morris and Hume, Howard & Davis, all of Nashville, for defendant.

FELTS, J.   Plaintiff sued defendant for alleged negligence causing the electrocution of her 22-month-old child, James Richard Null.   At the close of the evidence for plaintiff the trial judge directed a verdict for defendant.   Plaintiff appealed in error and insists that the evidence made a case for the jury.

Defendant Board was created by Chapter 262, Private Acts of 1939, as an agency of the City of Nashville to acquire and operate the electric power distribution system in Davidson and adjoining counties.   It supplies electricity to homes and businesses in this area, and is thus performing a proprietary, not a governmental, function and is liable for negligence of its employees in the same way as a private individual.   Nashville Electric Service v. Luna, Tenn. Sup., 204 S. W. (2d) 529.

It has a high voltage line along Cook Road in Davidson County and through its step-down transformers it furnishes to homes on that road electric current of reduced voltages suitable for lights and other home uses. One of these homes belonged to a Mrs. Sands and was occupied by her daughter, Mrs. Hale.

It was at this house that this accident happened. It occurred about 9:15 A. M. June 15, 1946. Plaintiff was a neighbor and a relative of Mrs. Hale and had come with her small children to do some work for Mrs. Hale. The lights were off but the radio was on. These two mothers were at work in the house, with their babies in sight on the front porch.

Plaintiff saw her baby walk off the porch and start toward the back yard. She told her oldest child, a daughter nine, to bring the baby on the porch. In a minute or two the daughter came back and said the baby was asleep. He was lying on the ground some six feet from the porch beside the house and a few inches from two exposed charged wires attached to a piece of iron pipe sticking up out of the ground, which had been put there to serve as the ground connection for the wiring in the house. One of the other children was shocked and badly hurt before they knew what had caused the baby's injury. It was later ascertained by an autopsy that he had been killed by an electric shock from this ground.

The wiring in this house was for lights and was designed for a current of only 110 volts. The purpose of this ground was to protect the house circuit from excess voltages which might occur through lightning or other causes. There had been one or more electric storms shortly before this accident. That afternoon some men, doubtless defendant's employees, came, took out its

transformer in front of this house, and replaced it with a new one. They also looked at this ground, took up the piece of iron pipe, and measured the depth it had been in the ground—nine inches.

This house circuit had been installed in July, 1945, by Louis Sands, a brother of Mrs. Hale and an electrical contractor. Defendant's employees had marked the place on the outside of the house where they desired to put the meter and the place where they would connect defendant's wires with the house circuit. To make the ground, he ran two bare copper wires from the switch box inside the kitchen through the wall, brought them along the outside of the wall toward the front about 15 feet, clamped them to a piece of iron pipe about three feet long, and drove one end of it into the ground till it struck rock.

The first ground of recovery relied on by plaintiff is that defendant was guilty of common law negligence which caused the death sued for. There is no dispute as to the applicable law.

■ Where a company merely transmits its electric current from its line to the consumer's wires, which it did not install and does not control, it has no duty to inspect such wires and is not liable for injury caused by defects in them. Gas & Electric Co. v. Speers, 113 Tenn. 83, 81 S. W. 595; Delaney v. Town of Etowah, 182 Tenn. 386, 187 S. W. (2d) 531.

■ But where the company knows of such a defect, its duty is to stop and not to send its deadly current to the defective wiring of the consumer, and it is liable for injuries to person or property caused by breach of this duty. Gas & Electric Co. v. Speers, supra; Bristol Gas

& Electric Co. v. Deckard, 6 Cir., 10 F. (2d) 66, 67; and cases cited in Annotation, 134 A. L. R. 526-529.

In such a case the company's duty to protect the consumer and others lawfully on his premises is similar to that which it owes the public to protect them from its overhanging wires (Bristol Gas & Electric Co. v. Deckard, supra), and this requires it to exercise the highest or utmost degree of care. Nashville Interurban Ry. Co. v. Gregory, 137 Tenn. 422, 429, 193 S. W. 1053; Bristol Telephone Co. v. Weaver, 146 Tenn. 511, 525, 243 S. W. 299; Town of Clinton v. Davis, 27 Tenn. App. 29, 177 S. W. (2d) 848.

To support this charge of common law negligence, plaintiff insists that the jury could have reasonably found from the evidence that this ground for the house circuit failed to meet the safety requirements of Chapter 897, Private Acts of 1921, and was defective and dangerous; and that defendant inspected it, knew it was defective and dangerous, and with such knowledge connected its wires to those in the house and continued to send its current on them until it killed this child.

By that Act, applicable to Davidson County, the Legislature enacted safety regulations for installing wiring for electric current for light, heat, and power purposes. That Act adopted, as the standard for such work, the National Electrical Code rules. They state:

"Circuits are grounded for the purpose of limiting the voltage upon the circuit which might otherwise occur through exposure to lightning or other voltages higher than that for which the circuit is designed; or to limit the maximum potential to ground due to normal voltage."

These rules permit the use of iron pipes as electrodes for grounds where a water piping system is not available for such use; but they require that the iron pipes "shall be not less than ¾" internal diameter" and shall be driven into the ground "to a depth of at least 8 feet." Where this cannot be done because of rock bottom, the pipes "shall be buried in a horizontal trench" and "shall not be less than 8 feet in length."

The ground in the case before us failed to meet these requirements. This pipe was ¾" external diameter, not ¾" internal diameter. It was only about three feet long, driven only nine inches into the ground with the other end sticking up about two feet above the ground. These copper wires were not insulated. If they had been insulated and the pipe the required length and completely buried, this accident would not have happened. We think the jury could well have found that this ground was defective and dangerous and that such defect, coupled with defendant's continued sending of its current through the house circuit, was a substantial factor in causing the death of this child.

This, however, was not enough to charge defendant. There must also have been evidence from which the jury could have found that defendant had knowledge of the defect. Plaintiff sought to prove such knowledge on the part of defendant by evidence as to the course of dealing between it and the Davidson County Electrical Inspector and a custom by it to connect and furnish its current to house circuits before they had been inspected by the Inspector and to make the inspections itself before making the connections.

The Legislature by the Act referred to created the office of Electrical Inspector and charged him with the

duty of enforcing its safety requirements. It made it his duty to make proper inspections of all wiring for light, heat, and power purposes; to collect the inspection fees prescribed; to approve such wiring as met the requirements of the Act and issue a certificate of his approval; and then to issue written permits allowing electric current to be supplied to such wiring.

The Inspector was notified when the wiring in this house was finished. He, however, did not inspect it, did not approve it, and did not issue any certificate of approval. Instead, he telephoned defendant and it filled out a so-called permit itself. It did this from a pad of printed blank form permits which had been furnished it by the Inspector, and which form (Ex. 1, Beazley) was as follows:

"Service Connection for Electric Wiring is Hereby granted.

For ...............................................

At ...............................................

Work

Done by ...........................................

Lights ...... Range ...... W. H. ...... Heater ......

Pending Inspection

Electrical Inspector, Davidson County"

The Inspector, A. E. Beazley, testified they had adopted this custom of defendant's filling out the blank form permits and connecting and furnishing its current to house circuits, without any inspection by him, because the business of his office had grown so that he could not make the inspections beforehand, as required by the statute. He said the inspection fees had increased from $1,500 in 1923 to between $15,000 and $20,000 in 1947. Asked

if it was a custom of defendant to make inspections itself before making its connections, he said:

"The Witness: It is not customary for them to make inspections, they have what they call slip permission pending further inspection, they go to work and if that service is all right they have permission to cut it in if that service is all right. (Tr. p. 43)

.    .    .    .    .    .

"Q. I might have misunderstood you said the permission the Power Board had when they connected in their service was this printed form which was filled out in writing which was released over the phone from your office? A. That is right. In other words, if they should happen to find something wrong in the meantime I would notify the power company then they would discontinue service.

"Q. And upon your inspection or if anything came to your attention that went wrong, then you would rescind this order? A. That is correct. (Tr. pp. 66, 67)"

This Inspector said he tried to make inspections as soon as he could get around to them, and usually did this in a few days after defendant had completed its connections in the particular neighborhood. He thought he had done that in this case and found everything in order, but he had no record of any such inspection. He did recall making an inspection after this accident and ordering the current shut off till a proper ground was made.

The contractor Sands first said it was a custom of defendant to inspect house wiring before connecting and furnishing current to it, but he later said what he meant was that it was defendant's custom to inspect the premises and designate to the contractor a suitable place for

putting the cut in, or the place where it would connect its wires to the house circuit.

Viewing these circumstances in their most favorable aspect to plaintiff, we think they fell short of proving that defendant inspected the wiring in question or knew of the defect in it. Instead, they tended to prove that it was a custom of the Inspector and defendant for it to make its connection to house circuits without inspections, either by him or itself. He did say that under his so-called permit defendant had permission to make its connections if the house circuits were all right, and that if its employees should happen to find something wrong he would notify them to discontinue the service. But he also said it was not customary for them to make inspections.

Plaintiff contends that defendant's employees must have seen this defect without any formal inspection. It is argued that they must have observed the outcropping rock around the house and known that the iron pipe could not be very deep in the ground; that the pipe was of less than the required diameter, was sticking up out of the ground, and was plainly visible; that the bare copper wires were equally visible; and that this ground connection was almost under the place where these employees connected defendant's wires with the house wiring.

These circumstances, we think, did not permit the jury to infer that defendant's workmen actually saw this defect. The most that could be inferred was that they could have seen it if their attention had been called to it. Their work was above and some distance away from this ground connection and did not necessarily direct their attention to the defect. For all the record shows, they

might have seen it, or might not. The evidence made the one supposition no more probable than the other. Any choice between them could have been but a guess—not a permissible mode of reaching a conclusion in a trial by rational process (Everett v. Evans, Tenn. App., 207 S. W. (2d) 350, and cases there cited). So we think the evidence failed to make a case for the jury upon the issue of common law negligence.

The second ground of liability urged by plaintiff is that defendant violated the statute, Chapter 897, Private Acts of 1921, and was guilty of negligence per se which caused the death sued for.

As detailed above, the contractor failed to install this ground connection in accord with the safety requirements of this Act. This ground was defective and dangerous. The Inspector did not inspect it, as required by the Act. Defendant knew this and knew he had not issued the written permit, as provided by the Act. With this knowledge it connected and furnished electric current to the house circuit. It thus violated the plain prohibition of the Act. Among other things the Act provides:

"That the Electrical Inspector shall proceed to make the proper inspection when notified by the contractor doing the work, and he shall issue a certificate with his approval when the work is found by him to be in accordance with the rules and requirements hereinafter specified. (sec. 3)

.   .   .   .   .   . .

"It shall be unlawful for any person, firm or corporation to furnish or connect electric current to the wiring on any building or structure, whether on the interior or exterior of such building or structure, until said wires

are first duly inspected and a written permit issued allowing current to be supplied. (sec. 7)

. . . . . .

"That any person or persons who shall violate any provision of this Act or who shall fail to comply with any of its requirements shall be subject to a fine of not less than Five ($5.00) Dollars nor more than Twenty-five ($25.00) Dollars for each offense. Each and every day's continuance of any violation of a provision of this Act shall be deemed a separate offense. (sec. 10)"

■ The object of this Act is to provide safe methods of installing electric wiring, to make as safe as possible the use of the subtle and dangerous force of electricity, and to protect human life and property from accidents caused by unsafe and dangerous electric wiring. Quite clearly, this child was among the class of individuals within the protection of the statute, and his life was one of the interests that was meant to be protected by it.

■ It has long been well settled in this State that a violation of a statute which causes injury to one within the protection of the statute is negligence per se and actionable. Queen v. Dayton Coal & Iron Co., 95 Tenn. 458, 32 S. W. 460, 30 L. R. A. 82, 49 Am. St. Rep. 935; Riden v. Grimm Bros., 97 Tenn. 220, 36 S. W. 1097, 35 L. R. A. 587; Memphis St. Ry. Co. v. Haynes, 112 Tenn. 712, 81 S. W. 374; Adams v. Cumberland Inn Co., 117 Tenn. 470, 101 S. W. 428; Chattanooga Ry. & Light Co. v. Bettis, 139 Tenn. 332, 202 S. W. 70; Tennessee Cent. Ry. Co. v. Page, 153 Tenn. 84, 282 S. W. 376; Inter-City Trucking Co. v. Daniels, 181 Tenn. 126, 129, 178 S. W. (2d) 756, 757.

"Generally speaking, the violation of a rule of the common law, a statute, a municipal ordinance, or any failure

to perform a duty imposed for the public safety, is actionable negligence, and whoever suffers in consequence of the violation or nonperformance of the law may maintain an action against the offender for the injuries sustained. Adams v. [Cumberland] Inn Co., 117 Tenn. 470, 101 S. W. 428." Mr. Justice Cook in Tennessee Cent. Ry. Co. v. Page, 153 Tenn. 84, 91, 282 S. W. 376, 377.

The jury could well have found that defendant's violation of this statute was the legal or proximate cause of the death of this child. It was one of the kind of accidents which the statute was meant to prevent. It was immaterial that some eleven months lapsed between defendant's initial violation and the accident. Each and every day's continuance of the violation was a separate offense under the Act. Defendant's violation and the dangerous force it loosed were both continuous and operative up to the very moment when that force killed this child. But for them the death would not have occurred.

In such case the mere lapse of time between the wrong and the injury does not prevent the wrong from being the legal cause of the injury. Henningsen v. Markowitz, 132 Misc. 547, 230 N. Y. S. 313; Thomas v. Winchester, 6 N. Y. 397, 57 Am. Dec. 455; MacPherson v. Buick Motor Co., 217 N. Y. 382, 111 N. E. 1050, L. R. A. 1916F, 696, Ann. Cas. 1916C, 440.

So we think the evidence made a case for the jury under the issue of statutory negligence, and it was error to direct a verdict for defendant on this issue.

It is urged here, as it was successfully below, that owing to the growth of the business of the Inpector's office, the provisions of the statute have become difficult or impossible of observance; that inspections can be made as well or better after defendant has begun

to supply its electric current; that the practice adopted by the Inspector and defendant of supplying the current without prior inspection was for the public convenience; and that defendant ought not to be held negligent for following such practice.

We cannot accept this argument. If conditions have given rise to the need for more inspectors, in order that the Act may be properly enforced, it is for the Legislature to provide them. The courts have no power to set aside the plain provisions of the statute. "A statute designed for the protection of human life is not to be brushed aside as a form of words, its commands reduced to the level of cautions, and the duty to obey attenuated into an option to conform." Cardozo, J., in Martin v. Herzog, 228 N. Y. 164, 171, 172, 126 N. E. 814, 816.

The judgment of the circuit court is reversed and the case remanded for a new trial not inconsistent with this opinion. The costs of the appeal in error are adjudged against defendant. The costs below will abide the outcome.

Howell and Hickerson, JJ., concur.