# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
September 12, 2005 Session

## MESSER GRIESHEIM INDUSTRIES, INC. v. EASTMAN CHEMICAL COMPANY

**Appeal from the Circuit Court for Knox County**
**No. 3-64-97      Wheeler Rosenbalm, Judge**

---

**No. E2005-00226-COA-R3-CV FILED NOVEMBER 10, 2005**

---

Eastman Chemical Company ("Eastman") and Cryotech of Kingsport, Inc. ("Cryotech") entered into an agreement whereby Cryotech would purchase non-food grade feedgas from Eastman which was roughly 78% carbon dioxide ("$CO_2$").  Cryotech then would purify the feedgas and sell it as food grade $CO_2$.  Messer Griesheim Industries, Inc. ("Messer") purchased the $CO_2$ from Cryotech.  Messer in turn sold the $CO_2$ to soft drink manufacturers.  The $CO_2$ sold to Messer was contaminated with cyanide and resulted in property damage to Messer and Messer's customers.  In the third appeal arising from this litigation, we must determine whether the Trial Court correctly granted summary judgment to Eastman on Messer's claims for breach of warranty, products liability, and negligence, and whether the Trial Court properly refused to allow Messer to amend its complaint to assert a claim for negligence *per se*.  We affirm in part, vacate in part, and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part and Vacated in Part; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Gregory M. Leitner, Michael K. Alston, and Timothy L. Mickel, Chattanooga, Tennessee, Mark G. Arnold, St. Louis, Missouri, Arthur G. Seymour, Jr., Knoxville, Tennessee, for the Appellant Messer Griesheim Industries, Inc., d/b/a MG Industries.

W. Randall Wilson, James T. Williams, IV, and William A. Harris, III, Chattanooga, Tennessee, for the Appellee Eastman Chemical Company.

# OPINION

## Background

This is the third occasion we have had to consider an appeal in this litigation. Our opinion from the second appeal sets forth a good summary of what gave rise to this lawsuit. Finding no need to reinvent the wheel, we quote liberally from that opinion to set forth the general background:

> Cryotech of Kingsport, Inc., (hereinafter "Cryotech") operates gas purification facilities and produces food grade liquid carbon dioxide. The Appellee, Eastman Chemical [Company] (hereinafter "Eastman"), owns and operates a coal gasification plant in Kingsport. The Appellant, Messer Griesheim, Inc., d/b/a MG Industries (hereinafter "Messer"), is a distributor of liquid carbon dioxide, which it purchases in bulk and sells to customers for various food and medical uses.

> In 1988 Cryotech and Eastman entered into an agreement pursuant to which Cryotech would purchase a carbon dioxide rich waste stream (hereinafter "feedgas") from Eastman which Eastman had, prior to that time, vented into the atmosphere. The price paid to Eastman by Cryotech under the agreement was determined by the concentration of carbon dioxide in the feedgas and the volume of feedgas to be purchased was measured by the amount of carbon dioxide Cryotech shipped to its customers.

> At the same time it entered [into] the feedgas agreement Cryotech also entered into a lease of land belonging to Eastman adjacent to Eastman's Kingsport plant and constructed thereon a carbon dioxide purification facility.

> Cryotech's purification facility became operational in 1992 and Cryotech began selling carbon dioxide to Messer and other customers. Shortly after operations began Cryotech began experiencing problems due to chemical contaminants in the feedgas it was purchasing from Eastman. In spring of 1993, Eastman discovered the presence of hydrogen cyanide (hereinafter "HCN"), a toxic and potentially lethal substance, on Cryotech's catalyst and informed Cryotech of this finding. The feedgas agreement had not included HCN in a description designated "Typical Composition of Carbon Dioxide Gas" and deposition testimony indicates that Eastman had previously represented that it had never detected any

cyanide in the feedgas. Because of resulting increased purification costs, Cryotech withheld payment for the feedgas and eventually owed Eastman an arrearage of over one million dollars.

Cryotech began monitoring the HCN content of the feedgas more than once a day and frequently discussed the results of such monitoring with Eastman representatives. In late 1993 Cryotech detected increasing levels of HCN and complained to Eastman about the increased cost of its removal. Eastman sought to determine the cause of the increased HCN levels and endeavored to assist Cryotech in identifying better and less expensive ways Cryotech could remove the HCN. Eastman also took some actions in its own facility to try to reduce the HCN content of the feedgas. In 1996 Eastman installed its own HCN analyzer to prepare for compliance with new EPA regulations; however, this analyzer exhibited various problems and was ultimately determined to be an unreliable measure of HCN levels.

In March of 1996 Messer began selling carbon dioxide obtained from Cryotech to a large manufacturer of carbonated beverages. Shortly thereafter, this manufacturer notified Messer that it was receiving customer complaints regarding the odor and/or taste of its beverages. Testing revealed the presence of HCN in Cryotech's carbon dioxide and thereafter Eastman discontinued supplying feedgas to [Cryotech]. Subsequently, several of Messer's other customers claimed that their product had been adulterated by the contaminated carbon dioxide and that beverage canisters containing the contaminated carbon dioxide were rendered unusable and had to be destroyed. Messer settled these claims in anticipation of litigation. Messer also incurred expenses in cleaning its own storage tanks and tanker cars which had contained the contaminated carbon dioxide. Messer incurred additional expenses as a result of the adulteration of uncontaminated carbon dioxide when it was mixed with carbon dioxide purchased from Cryotech. Altogether, Messer asserts that it has sustained damages totaling nearly eight million dollars as a result of injury to its own property and the property of its customers and that it has suffered additional damages "including but not limited to, business losses, substantial attorney's fees, expenses incurred in determining the origin of the hydrogen cyanide contamination, and the costs of cover." There are no allegations of personal injury in this case.

*Messer Griesheim Indus., Inc. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457, 460-61 (Tenn. Ct. App. 2003)(hereafter "*MG II*").

At issue in *MG I* was whether the Trial Court properly granted summary judgment
The first appeal surrounded numerous claims by Messer against Mellon Financial Services Corp. #3 ("Mellon"). Mellon approved a construction loan enabling Cryotech to build the gas purification facility on Eastman's premises. After approving the construction loan, Mellon took an active role during the construction of the facility. Once the facility was completed, the financing agreement between Cryotech and Mellon was converted into a lease of the structure and equipment, "with Mellon denominated the owner-lessor and Cryotech the lessee." *Messer Griesheim Indus., Inc., v. Cryotech of Kingsport, Inc.*, 45 S.W.3d 588, 595 (Tenn. Ct. App. 2001)(hereafter "*MG I*"). It was this lessor/lessee relationship which gave rise to many of the claims Messer asserted against Mellon.

At issue in *MG I* was whether the Trial Court properly granted summary judgment to Mellon on all of Messer's various claims.[1] We initially discussed whether summary judgment was appropriate on Messer's negligence claim. In affirming the judgment of the Trial Court, we determined that the lease between Mellon and Cryotech actually was a financing lease, as opposed to a "true" lease, and the purpose of the lease was for Mellon to reserve "unto itself some rights in order to secure its financial interest in the facility." *MG I*, 45 S.W.3d at 603. Because of the nature of the lease as a financing lease, we concluded that Mellon did not owe Messer a duty of care and Messer's negligence claim against Mellon properly was dismissed.[2] We also rejected Messer's argument that Mellon had a non-delegable duty of care, holding that the manufacture of liquid carbon dioxide for use in soft drinks and for other uses was not an inherently dangerous activity. *Id*. Messer also asserted various products liability and breach of warranty claims against Mellon. We concluded these claims also properly were dismissed because there was no duty owed by Mellon to Messer and because there was no privity of contract between these two entities. In short, we concluded that the Trial Court correctly granted summary judgment to Mellon as to all of Messer's claims.

This case was remanded to the Trial Court after we affirmed the grant of summary judgment to Mellon. While on remand, Messer settled with Cryotech and an agreed order dismissing Cryotech was entered in November of 2001, thereby leaving Eastman as the sole defendant. *See MG II*, 131 S.W.3d at 461 n.1. After Eastman filed its motion for summary judgment, the Trial Court concluded that Messer's alleged damages were properly characterized as economic losses rather than property damage. Because privity of contract was necessary to recover for economic losses, and because there was no privity between Messer and Eastman, the Trial Court dismissed Messer's products liability and breach of contract claims. Likewise, Messer's breach of warranty claim was

___

[1] When the Trial Court granted summary judgment to Mellon, the judgment was certified as a final judgment pursuant to Tenn. R. Civ. P. 54.02. *See MG I*, 45 S.W.3d at 598. This allowed us to consider whether it was proper to dismiss those claims even though the battle between Messer and defendants Cryotech and Eastman raged on.

[2] Because Mellon owed no duty to Messer we also affirmed the grant of summary judgment on Messer's negligent entrustment claim as well as its claim based on the Restatement (Second) of Torts § 389.

-4-

dismissed for "lack of privity and/or property damage." *MG II*, 131 S.W.3d at 461. After the Trial Court also dismissed Messer's claim pursuant to the Tennessee Consumer Protection Act, the few remaining claims were held in abeyance. *Id*. at 461-62. A few months later, Eastman filed a renewed motion for summary judgment on the remaining claims. The Trial Court ultimately granted the motion, and Messer appealed for the second time. *Id*. at 462.

Several of the issues in *Messer II* centered around whether Messer's claimed damages were properly categorized as economic losses or property damage. We observed that the "economic loss doctrine provides that '[i]n a contract for the sale of goods where the only damages alleged come under the heading of economic losses, the rights and obligations of the buyer and seller are governed exclusively by the contract.' *Trinity Industries v. McKinnon Bridge Co.*, 77 S.W.3d 159 (Tenn. Ct. App. 2001). Consequently, a plaintiff may not maintain a claim for purely economic losses absent contractual privity with the party charged with responsibility for those losses." *MG II*, 131 S.W.3d at 463. However, we went on to add that pursuant to statute, if the loss is properly characterized as property damage, then there is no need for privity for claims based on negligence, strict liability, breach of warranty, or the Uniform Commercial Code. *See* Tenn. Code Ann. § 29-34-104. After noting the distinction between recovering on a claim for economic loss versus property damage, and because there was no privity of contract between Messer and Eastman, we set about to determine into which of these two categories Messer's alleged damages fell. We resolved this as follows:

> [W]e are compelled to conclude that the contaminated feedgas, as the product placed in the stream of commerce by Eastman, was "the product itself" and the property of Messer and its customers which was injured as a result of contact with the contaminated carbon dioxide was "other property." Messer is not required to establish privity to maintain its cause of action in tort for damages arising from injury to this other property and the Trial Court erred in granting summary judgment against Messer on that basis. It is our determination that Messer's carbon dioxide which was contaminated as a result of being mixed with the contaminated carbon dioxide constitutes such injured property. We also find that the soft drink ingredients and cans of Messer's customers which were ruined as a result of contact with the contaminated carbon dioxide fall within this category. We do not, however, agree that the cost incurred by Messer in cleaning its tanker cars and storage tanks is properly classified as a cost related to property damage.…

*MG II*, 131 S.W.3d at 466. Thus, we affirmed the grant of summary judgment on Messer's claim for damages incurred in having to clean its tanker cars and storage tanks. However, because other losses sought by Messer were "property damage" and because the Trial Court had dismissed those claims solely because it believed them to be economic losses, we reversed the grant of summary judgment as to those claims.

-5-

We next addressed whether the Trial Court properly granted summary judgment to Eastman on Messer's claims alleging fraud as well as a violation of the Tennessee Consumer Protection Act ("TCPA"). After summarizing the proof and inferences each party claimed could be derived from that proof, we concluded the undisputed material facts showed that Eastman had not engaged in any fraudulent or deceptive acts prohibited by the TCPA or otherwise. We stated:

> The [feedgas] agreement between Cryotech and Eastman expressly acknowledges that Eastman is generating crude carbon dioxide which, "in its raw form, is not suitable for food use" and that Cryotech "proposes to construct and operate a facility for the purification and liquefaction" of such carbon dioxide. The product which Cryotech was in the business of selling and producing was food grade carbon dioxide. The product sold by Eastman to Cryotech was *non-food grade* carbon dioxide. There is no evidence that Eastman ever represented to Cryotech, Messer or anyone else that the product it was selling to Cryotech was fit for human consumption.
>
> * * *
>
> Eastman never represented that the product it sold to Cryotech was anything other than non-food grade carbon dioxide. Furthermore, Messer cannot have relied upon a misrepresentation by Eastman that the feedgas sold to Cryotech did not contain HCN because, when the alleged injuries occurred to Messer in 1996, Cryotech was well aware that HCN was a constituent of the feedgas, having been informed of this fact by Eastman in 1993.

*MG II*, 131 S.W.3d at 467, 469 (emphasis in original).[3]

To summarize, the only remaining defendant after the second appeal was concluded was Eastman. Messer had settled all of its claims against Cryotech, and we had affirmed the grant of summary judgment to Mellon. We also had affirmed the grant of summary judgment to Eastman on Messer's claims for fraud and a violation of the TCPA. The only remaining claims were Messer's claims against Eastman for "other" property damaged by the contaminated feedgas, which did not include costs incurred by Messer in cleaning its storage tanks and tanker cars and the like because those were purely economic losses for which Messer could not recover in the absence of privity with Eastman.

---

[3] Although not directly pertinent to this appeal, another significant issue in *MG II* was whether Eastman and Cryotech were engaged in an implied partnership or joint venture which Messer claimed would render Eastman jointly and severally liable for Messer's tort and contract claims against Cryotech. *MG II*, 131 S.W.3d at 469. Finding no evidence that Cryotech and Eastman ever intended to share profits, we affirmed the Trial Court's determination that Cryotech and Eastman were not engaged in an implied partnership or a joint venture. *Id*. at 473.

On remand, Eastman filed another summary judgment motion seeking dismissal of the remaining claims which had survived the second appeal. Following a hearing, the Trial Court granted the motion for summary judgment, although it did not specify the exact reasons for granting the motion. Messer appeals raising the following issues, which we quote:

I.    The Trial Court erred in granting Eastman summary judgment on MG's breach of express warranty claims because there is substantial evidence that Eastman breached an express warranty to provide feedgas in compliance with the description in the feedgas agreement.

II.   The Trial Court erred in granting Eastman summary judgment on MG's product liability claims because there is substantial evidence that Eastman manufactured a defective product or substantially participated in the integration of its feedgas into Cryotech's defective product.

III.  The Trial Court erred in granting Eastman summary judgment on MG's negligence claims because there is substantial evidence that Eastman breached a duty to protect downstream purchasers from unreasonable and foreseeable harm from its cyanide-laced feedgas.

IV.   The Trial Court erred in granting Eastman's motion to strike MG's negligence claims based upon violations of the FDCA because MG sufficiently pleaded the facts supporting this theory of negligence.

## Discussion

In *Blair v. West Town Mall*, our Supreme Court recently reiterated the standards applicable when appellate courts are reviewing a motion for summary judgment. *Blair v. West Town Mall*, 130 S.W.3d 761 (Tenn. 2004). In *Blair*, the Court stated:

The standards governing an appellate court's review of a motion for summary judgment are well settled. Since our inquiry involves purely a question of law, no presumption of correctness attaches to the lower court's judgment, and our task is confined to reviewing the record to determine whether the requirements of Tennessee Rule of Civil Procedure 56 have been met. *See Staples v. CBL & Assoc., Inc.*, 15 S.W.3d 83, 88 (Tenn. 2000); *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997); *Cowden v. Sovran Bank/Central South*, 816 S.W.2d 741, 744 (Tenn. 1991). Tennessee

Rule of Civil Procedure 56.04 provides that summary judgment is appropriate where: 1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion, and 2) the moving party is entitled to a judgment as a matter of law on the undisputed facts. *Staples*, 15 S.W.3d at 88.

* * *

When the party seeking summary judgment makes a properly supported motion, the burden shifts to the nonmoving party to set forth specific facts establishing the existence of disputed, material facts which must be resolved by the trier of fact.

To properly support its motion, the moving party must either affirmatively negate an essential element of the non-moving party's claim or conclusively establish an affirmative defense. If the moving party fails to negate a claimed basis for the suit, the non-moving party's burden to produce evidence establishing the existence of a genuine issue for trial is not triggered and the motion for summary judgment must fail. If the moving party successfully negates a claimed basis for the action, the non-moving party may not simply rest upon the pleadings, but must offer proof to establish the existence of the essential elements of the claim.

*Blair*, 130 S.W.3d at 763-64, 767 (quoting *Staples*, 15 S.W.3d at 88-89).

Our Supreme Court also has provided instruction regarding assessing the evidence when dealing with a motion for summary judgment, stating:

The standards governing the assessment of evidence in the summary judgment context are also well established. Courts must view the evidence in the light most favorable to the nonmoving party and must also draw all reasonable inferences in the nonmoving party's favor. *See Robinson v. Omer*, 952 S.W.2d at 426; *Byrd v. Hall*, 847 S.W.2d at 210-11. Courts should grant a summary judgment only when both the facts and the inferences to be drawn from the facts permit a reasonable person to reach only one conclusion. *See McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995); *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995).

*Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000).

The Feedgas Agreement refers to Eastman as the "Seller" and Cryotech as the "Buyer" and contains the following provisions:

WHEREAS, Seller is now generating non-food grade crude carbon dioxide gas ("$CO_2$ Gas") as a co-product from Seller's existing coal gasification plant ("Seller's Plant") located in the vicinity of Kingsport, Tennessee, which $CO_2$ Gas, in its raw form as generated by Seller, is not suitable for food use….

\* \* \* \*

5.0    QUALITY

Based upon the average of the analyses of the $CO_2$ Gas conducted during the normal operation of Seller's Plant, Seller represents to Buyer that a typical composition of the $CO_2$ Gas to be supplied by Seller is set forth in Exhibit A attached hereto and made a part hereof. If the composition of the $CO_2$ Gas varies materially from that set forth in Exhibit A, then the price paid by Buyer shall be adjusted in accordance with Article 8.0 hereof.

\* \* \* \*

8.0    PRICE AND PAYMENT TERMS

\* \* \* \*

8.4    If the quality of the $CO_2$ Gas made available by Seller to Buyer varies materially from the composition set forth in Exhibit A attached hereto, then the price paid by Buyer shall be adjusted in accordance with Exhibit B attached hereto.

\* \* \* \*

13.0    TERMINATION

\* \* \* \*

13.3    If after six (6) months prior written notice to Buyer, Seller alters its operations so as to

substantially modify the $CO_2$ Gas in its present form, and Buyer, in Buyer's sole discretion, determines that Buyer, for any economic or technical reason, is unable to use the modified gas, this Agreement can be terminated by Buyer as of the time of the modification.

15.0   LIABILITY

15.1   BUYER ASSUMES ALL RISKS OF LOSS THAT RESULT FROM THE USE OF THE $CO_2$ GAS PURCHASED HEREUNDER WHETHER USED SINGLY OR IN A COMBINATION WITH OTHER SUBSTANCES OR IN ANY PROCESS. SELLER SHALL NOT BE LIABLE AS TO GOODS DELIVERED FOR ANY EXEMPLARY OR SPECIAL DAMAGES, OR FOR CONSEQUENTIAL DAMAGES; provided, however, that such limitation of liability shall not apply to property damage suffered solely by Buyer as a result of Seller's negligence.

* * * *

15.3   Seller makes no representation or warranty, expressed or implied, as to the fitness or merchantability of the $CO_2$ Gas or the $LCO_2$. Seller's liability to Buyer shall be limited to the value of the $CO_2$ Gas delivered to Buyer.

15.4   The warranties of Seller set forth herein are exclusive of and in lieu of all other representations or warranties of Seller whether statutory, written, oral or implied, and Seller has not made and does not hereby make, nor shall it be deemed by virtue of having sold the $CO_2$ Gas pursuant to this Agreement to have made, any representation or warranty as to the merchantability or fitness for a particular purpose of the $CO_2$ Gas.

15.5    Limitations of Liability

(a)    Determination of the suitability of the $LCO_2$ furnished hereunder for the use contemplated by Buyer is the sole responsibility of Buyer, and Seller shall have no responsibility in connection therewith.…

19.0    <u>GENERAL PROVISIONS</u>

19.1    This Agreement, the Exhibits and other attachments hereto, and all documents incorporated herein by reference, constitute the entire agreement between the parties hereto, supersede all previous agreements and understandings, whether oral or written, relating to the subject matter hereof, and may not be changed or modified orally.…

Exhibit A to the Feedgas Agreement sets forth the "typical" composition of the feedgas stating it is 78.5% ± 2% $CO_2$, with the remaining 21.5% ± 2% being something other than $CO_2$. The list of other components typically contained in the feedgas did not include cyanide.

Messer argues that because Eastman provided Cryotech with a specific description of the "typical" composition of the feedgas, and because that description did not identify cyanide as something that may be in the feedgas, this amounts to an express warranty that the feedgas would not contain cyanide. We disagree. As we have already held, "Eastman never represented that the product it sold to Cryotech was anything other than non-food grade carbon dioxide." *MG II*, 131 S.W.3d at 469. There is no dispute that the feedgas sold to Cryotech was non-food grade at all times. Messer downplays our previous holding by stating it is "not claiming that Eastman warranted a food-grade product. MG simply asserts that Eastman warranted carbon dioxide gas of a certain composition and quality." The Feedgas Agreement is clear that Eastman and Cryotech contemplated the composition of the feedgas could change over time and this understanding was specifically reflected in the agreement. Section 5.0 of the Feedgas Agreement provides that the price of the feedgas shall be adjusted if the feedgas varies materially from the "typical" composition contained in Exhibit A. This, of course, presumes that the composition as varied still is usable for Cryotech's intended purposes. However, Section 13.3 of the Feedgas Agreement goes on to provide that if the composition of the feedgas is substantially modified to the point that it is unusable by Cryotech for "any economic or technical reason," then Cryotech, at its sole discretion, could terminate the Feedgas Agreement altogether.

Eastman correctly points out that in the lease between Cryotech and Eastman dated July of 1998, Exhibit B is titled "Typical Return Condensate Stream Composition (anticipated)." Part 1 of that Exhibit describes "[m]aterial received from and [to be] returned to Eastman." The materials listed in Part 1 were derived from a feedgas analysis provided by Eastman and one of the components listed in Part 1 is Hyrdogen Cyanide. We further note that Messer acknowledges in its brief that "Cryotech designed its plant to accommodate for concentrations of cyanide up to two ppm." If Eastman expressly warranted to Cryotech that the feedgas never would contain any cyanide, it makes absolutely no sense for Cryotech to go to the expense and trouble of designing a plant to accommodate the presence of a substance which was expressly warranted never to be present.

We agree with the Trial Court that the undisputed material facts demonstrate that Eastman made no express warranty to the effect that the feedgas never would contain any cyanide. The Trial Court's grant of summary judgment on Messer's claim for breach of warranty is affirmed and any remaining issues regarding whether Eastman could or did properly disclaim any warranties are pretermitted.

Next, we will consider whether the Trial Court properly granted summary judgment to Eastman on Messer's products liability claims. Messer argues that Eastman is liable as a manufacturer and seller of a component part of the contaminated feedgas, because the feedgas was defective or unreasonably dangerous and/or because Eastman substantially participated in the integration of its feedgas into Cryotech's defective product. Messer points out that under the Tennessee Products Liability Act, a manufacturer is defined as a "designer, fabricator, producer, compounder, processor or assembler of any product or its component parts." Tenn. Code Ann. § 29-28-102(4). Eastman argues that it is not a "manufacturer" as that term is defined in Tenn. Code Ann. § 29-28-102(4) because all Eastman did was supply Cryotech with a crude raw material. Eastman cites no authority in support of this conclusion and fails to offer any explanation as to how or why it is not a producer or processor of the feedgas it sold to Cryotech when the Feedgas Agreement itself states that the carbon dioxide gas sold by Eastman to Cryotech is "a co-product from [Eastman's] existing coal gasification plant…." Simply because Eastman had no viable use for the feedgas it produced prior to its relationship with Cryotech does not mean that the feedgas was not produced by Eastman as a byproduct in its coal gasification plant. We agree with Messer that Eastman is a "manufacturer" as that term is defined in Tenn. Code Ann. § 29-28-102(4).

In *Davis v. Komatsu America Indus. Corp.*, 42 S.W.3d 34 (Tenn. 2001), our Supreme Court adopted Section 5 of the Restatement (Third) of Torts: Products Liability (1997) as being the law in Tennessee. According to *Davis*:

> Consistent with the overwhelming weight of authority, the drafters of the *Restatement (Third) of Torts: Products Liability* (1997) included a streamlined and simplified statement of the doctrine as follows:

-12-

§ 5. Liability of Commercial Seller or Distributor of Product Components for Harm Caused by Products into Which Components are Integrated

One engaged in the business of selling or otherwise distributing product components who sells or distributes a component is subject to liability for harm to persons or property caused by a product into which the component is integrated if:

(a) the component is defective in itself ... and the defect causes the harm; or

(b)(1) the seller or distributor of the component substantially participates in the integration of the component into the design of the product; and

(2) the integration of the component causes the product to be defective ...; and

(3) the defect in the product causes the harm.

Echoing the judicial decisions discussing this issue, comment a explains the rationale for Section 5 as follows:

If the component is not itself defective, it would be unjust and inefficient to impose liability solely on the ground that the manufacturer of the integrated product utilizes the component in a manner that renders the integrated product defective. Imposing liability would require the component seller to scrutinize another's product which the component seller has no role in developing. This would require the component seller to develop sufficient sophistication to review the decisions of the business entity that is already charged with responsibility for the integrated product.

Comment e clarifies the parameters of the liability described by Section 5(b):

When the component seller is substantially involved in the integration of the component into the design of the integrated product, the component seller is subject to liability when the

integration results in a defective product and the defect causes harm to the plaintiff. Substantial participation can take various forms. The manufacturer or assembler of the integrated product may invite the component seller to design a component that will perform specifically as part of the integrated product or to assist in modifying the design of the integrated product to accept the seller's component. Or the component seller may play a substantial role in deciding which component best serves the requirements of the integrated product. When the component seller substantially participates in the design of the integrated product, it is fair and reasonable to hold the component seller responsible for harm caused by the defective, integrated product. A component seller who simply designs a component to its buyer's specifications, and does not substantially participate in the integration of the component into the design of the product, is not liable within the meaning of Subsection (b). Moreover, providing mechanical or technical services or advice concerning a component part does not, by itself, constitute substantial participation that would subject the component supplier to liability.

Having fully reviewed numerous authorities describing and defining the doctrine, we conclude that Tennessee products liability law recognizes and includes the component parts doctrine.

*Davis*, 42 S.W.3d at 40-41.

We acknowledge that the facts in the present case do not fit squarely into the component parts doctrine. The reason for this is that Cryotech was to purify the feedgas supplied by Eastman and, in effect, get rid of the contaminants. In other words, the feedgas was not a single component of the final product, but rather, the final product was the whole of Eastman's original product, i.e., the feedgas as supplied by Eastman, less any contaminants that had been removed. Having said that, we nevertheless believe that the rationale behind the component parts doctrine applies to this fact situation. The reason for this is that the attendant protections to be afforded consumers in certain circumstances are no less compelling here. The underlying theory supporting the doctrine does not disappear simply because Cryotech's final product was less than instead of more than the initial product supplied by Eastman. The feedgas supplied by Eastman is still very much a part of the final product sold by Cryotech, and is even more so than in the typical case involving a component part.

We reject Messer's claim that the feedgas supplied by Eastman was *per se* defective or unreasonably dangerous. The Products Liability Act defines a "defective condition" as "a

-14-

condition of a product that renders it unsafe for normal or anticipatable handling and consumption."
Tenn. Code Ann. § 29-28-102(2). The Act defines "unreasonably dangerous" as follows:

> "Unreasonably dangerous" means that a product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller, assuming that the manufacturer or seller knew of its dangerous condition.

Tenn. Code Ann. § 29-28-102(8).

Eastman's "product" was *non-food grade* carbon dioxide. By definition, it was not to be used for human consumption and any "normal or anticipatable" use of *that* particular product would not involve human consumption such as using it in soft drinks or the like. It was only after Cryotech purchased the non-food grade carbon dioxide and purified it that any potential use was to involve human consumption. Simply because Cryotech failed to properly purify the feedgas does not make the non-food grade feedgas supplied by Eastman to Cryotech either defective or unreasonably dangerous.[4]

In *Davis, supra*, the Supreme Court also recognized that the component parts doctrine is based on the premise that the obligation of a component parts manufacturer does not extend to anticipating how a component which is not in and of itself dangerous or defective can become dangerous or defective depending upon how it is integrated into the final product and sold by another. To hold otherwise would force component part manufacturers to "to retain private experts to review an assembler's plans and to evaluate the soundness of the proposed use of the manufacturer's parts. The added cost of such procedure both financially and in terms of stifled innovation outweighs the public benefit of giving plaintiffs an additional pocket to look to for recovery." *Davis*, 42 S.W.3d at 40 (quoting *Orion Ins. Co., Ltd. v. United Technologies Corp.*, 502 F. Supp. 173, 178 (E.D. Pa. 1980)).

We do not think the Tennessee Products Liability Act or the Restatement (Third) of Torts: Products Liability § 5 prohibits Eastman from simply selling its feedgas to an entity who claims the ability to purify the feedgas and then resell it. Nor do we believe that Eastman was obliged "to retain private experts to review an assembler's plans and to evaluate the soundness of the proposed use." However, this does not mean Eastman cannot be liable if it knew the feedgas contained cyanide and thereafter it: (1) substantially participated in the integration of its feedgas into the design of the food grade carbon dioxide as sold by Cryotech; (2) the integration of the feedgas

---

[4] It is important to note that Messer acknowledges in its brief that technology was available that could have removed the increased level of cyanide from the feedgas.

-15-

caused Cryotech's product to be defective; and (3) the defect in Cryotech's product caused the property damage. *See* Restatement (Third) of Torts:  Products Liability § 5(b)(1) - (3).

> As we noted previously:

> In late 1993 Cryotech detected increasing levels of HCN and complained to Eastman about the increased cost of its removal. Eastman sought to determine the cause of the increased HCN levels and endeavored to assist Cryotech in identifying better and less expensive ways Cryotech could remove the HCN.  Eastman also took some actions in its own facility to try to reduce the HCN content of the feedgas.

*Messer II*, 131 S.W.3d at 460.

From the record now before us, Eastman's activities in assisting Cryotech were more extensive after the increased levels of cyanide were detected than before.  For example, an Eastman memorandum dated August 28, 1995, summarizes a meeting held in Pittsburgh to discuss the problem involving the increased levels of cyanide.   The meeting was attended by various representatives from Eastman and Cryotech.  The stated purpose of the meeting was to "come to an agreement on the financial issues and to get a plan to solve the technical issues."  Attached to the memorandum was an exhibit detailing what had already been done to help remedy the problem, and what was planned for the future.  According to the exhibit, the following already had been done: (1) analytical work to identify HCN as contaminant; (2) adjusted $N_2$ flow to help $CO_2$ purity; (3) decoupled C-5 and C-6 columns (MeOH); (4) experiments to find a control knob for HCN; (5) filtered water on C-6; (6) cleaned E-20 to reduce MeOH injection; (7) purged MeOH for five weeks at cost of \$5,000/wk to reduce $NH_3$/HCN; (7) worked with ICI Katalco and local (Ken Hingle) to recommend: (a) more scrubber purge ($NH_3$ and MeOH), hotter catalyst bed temperature, regenerate with $N_2$ instead of $CO_2$, and also working as is Cryotech with ICI for an HCN catalyst; and (8) PI/Development support equivalent to ½ man-year.  The memorandum also identified the following that would be done: (1) find an exchanger $200ft^2$, 300 psig for heating gas to catalyst; (2) will install HCN and TOC analyzers, (3) will continue to investigate regeneration process (regenerate gas analyses and catalyst analyses); (4) continue PI support; (5) improve control strategy for MeOH and $H_2S$; and (5) implement new operating strategy.[5]

The foregoing is by no means exhaustive of the actions taken by Eastman to resolve the cyanide problem so that the entire undertaking between it and Cryotech could move forward.  At this point in the litigation, we need not decide whether Eastman is liable as a component part

---

[5] The memorandum lists "What we have done" and "What we will do."  Because the memorandum was authored by an Eastman representative and refers to Cryotech separately, as applicable to the resolution of Eastman's summary judgment motion we assume the memorandum is detailing only what Eastman had done, as opposed to what Eastman and Cryotech had done collectively.  Our ultimate resolution of this issue would not change if in fact the memorandum details the latter instead of the former.

manufacturer pursuant to the law as set forth in *Davis, supra*, and Section 5 of the Restatement (Third) of Torts: Products Liability (1997). Although we have already concluded that Eastman's feedgas was not *per se* defective, the $CO_2$ sold by Cryotech for food grade use clearly was. What must be decided is if there is a genuine issue of material fact regarding whether Eastman substantially participated in the integration of its feedgas, which it knew contained high levels of cyanide, into the final product sold by Cryotech. Based on the facts set forth above, we conclude that there is a genuine issue of material fact as to whether Eastman can be held liable as a component part manufacturer due to its substantial participation in the integration of its feedgas into Cryotech's final product. The Trial Court's grant of summary judgment to Eastman on Messer's products liability claim is, therefore, vacated.

The third primary issue raised by Messer is whether the Trial Court erred when it granted summary judgment to Eastman on Messer's negligence claim. Messer claims there is a genuine issue of material fact regarding whether Eastman "breached a duty to protect downstream purchasers from unreasonable and foreseeable harm from its cyanide-laced feedgas." One of the few matters in which both parties to this appeal agree is that courts generally apply the component parts doctrine to negligence as well as products liability claims. As stated by Eastman in its brief, "Eastman agrees with MG that the component part manufacturer doctrine … is equally applicable to negligence claims as product liability claims."

Eastman's argument that summary judgment was proper on Messer's negligence claim for the most part tracks its argument on Messer's products liability claim. For example, Eastman argues that it was merely a supplier of a raw material and, therefore, cannot be deemed a component part manufacturer, an argument which we have rejected. Eastman further argues that the decision to sell the improperly purified $CO_2$ to Messer rested solely with Cryotech and was something over which Eastman had no control. Eastman also argues that it was not aware that Cryotech was selling contaminated $CO_2$ and, therefore, Eastman had no duty to warn downstream purchasers.

Matthew Stevens ("Stevens") was a superintendent in Eastman's gasification department until sometime in 1994. In his deposition, Stevens initially stated that he did not know Cryotech was selling $CO_2$ that was contaminated with cyanide. However, Stevens acknowledged that Cryotech had designed its plant around the feedgas specifications supplied by Eastman, and during the relevant time period Cryotech was claiming its plant was not designed to compensate and remove cyanide at the levels being received in the feedgas. Stevens also testified as follows:

> Q. Did it ever become a concern of your's that Cryotech might be selling $CO_2$ to the public that contained hydrogen cyanide?

> A. When I learned that there was hydrogen cyanide in those samples, that I think there was some samples that was evaluated by Hedrick and some others, I was concerned from a safety perspective.… And so when I saw that there was hydrogen cyanide

-17-

present in that gas, I wanted to know, for my own personal understanding, what levels of cyanide were there. I knew that from some analyses, although I wasn't sure about the exact compositions. I wanted to know, and that's why I sent a note to Dr. Blickenstaff to find out. I wanted to know about the safety of that hydrogen cyanide in that gas.

Q.      Safety to humans?

A.      Yeah, safety to any people that were exposed to that.

Q.      Because you knew that Cryotech was selling $CO_2$ to the beverage market, didn't you, sir?

A.      Yes, I did.

William L. Trapp ("Trapp"), also a superintendent at Eastman, testified that he knew Cryotech was selling $CO_2$ to be used in soft drinks. Trapp stated he did not recall specifically asking anybody at Eastman whether contaminated $CO_2$ was being sold on the market by Cryotech. However, Trapp acknowledged that there "was probably some general discussion about that. I really don't remember a specific question, but it was discussed at least at some low level." Trapp then added that there was a "mild concern" at Eastman about whether cyanide was getting through Cryotech's processes. According to Trapp, Eastman inquired about Cryotech's ability to analyze the feedgas, and when Cryotech showed Eastman the equipment they had in place, "we were satisfied." Trapp also stated that he believed the inquiry surrounding whether Cryotech was selling cyanide contaminated $CO_2$ took place prior to the Messer "incident."

From the record before us, Messer has created a genuine issue of material fact regarding whether Eastman was negligent. There is a factual issue over whether Eastman substantially participated in the integration of its feedgas into the design of the food grade $CO_2$ sold by Cryotech while knowing that the $CO_2$ was contaminated with cyanide and being sold by Cryotech on the market to purchasers who intended to use the $CO_2$ in a manner requiring food grade quality. Again, we need not and do not express any opinion on whether Eastman actually had or should have had such knowledge and was negligent. As with the products liability claim, we hold only that based on the record now before us, there is a genuine issue of material fact on this aspect of Messer's negligence claim.

Eastman also claims it had no control over whether or not Cryotech sold its final product to Messer and, therefore, Eastman cannot be found liable for negligence. We agree with this statement only to a point. Cryotech certainly had the ability not to sell the $CO_2$ if it knew the $CO_2$ had not been properly purified and contained potentially dangerous levels of cyanide. At the same time, however, Eastman had the ability to stop selling Cryotech its feedgas if it knew or reasonably should have known that: (1) Cryotech's technology was insufficient to rid the feedgas of the

cyanide, or for whatever reason the $CO_2$ was not being properly purified and contained potentially dangerous levels of cyanide; and (2) Cryotech nevertheless was selling the cyanide laced $CO_2$ to purchasers who in turn were using that $CO_2$ for food grade purposes.  Stated another way, even if a manufacturer such as Eastman makes no express warranty about the quality of its product and that product is not inherently dangerous or defective, we do not believe that such a manufacturer may escape potential liability if it *continues* to sell its product after learning its product contains a dangerous contaminant that is not being removed as it should be by its purchaser who is selling the contaminated final product to be used in the manufacture of food or the like.  This factual scenario gives rise to a duty to the downstream purchasers separate and apart from whether the manufacturer substantially contributed to the integration of its product into the final product under the component parts doctrine.  There is a genuine issue of material fact as to whether the underlying facts would support imposition of such a duty on Eastman and, if so, whether Eastman acted reasonably in carrying out that duty.  Finding a genuine issue of material fact, the Trial Court's grant of summary judgment on Messer's negligence claim is vacated.

The final issue is whether the Trial Court erred when it granted Eastman's motion to strike Messer's negligence claim based upon a violation of the federal Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 331 *et seq.*  Eastman's most recent motion for summary judgment, which followed the first two appeals, moved to strike Messer's negligence *per se* claim because that claim had not been specifically pled in the complaint, as twice amended.  Messer argues that the complaint references a violation of the FDCA and this should be considered sufficient for pleading a negligence *per se* claim.

In *Alex v. Armstrong*, 215 Tenn. 276, 385 S.W.2d 110 (1964), our Supreme Court stated:

> The rules in Tennessee relating to liability for the violation of a statute have been stated as follows:
>
>> "It is well settled that a failure to perform a statutory duty is negligence per se, and, if the injury is the proximate result or consequence of the negligent act, there is liability."  *Wise & Co. v. Morgan*, 101 Tenn. 273, 278, 48 S.W. 971, 44 L.R.A. 548.
>>
>> "It has long been well settled in this State that a violation of a statute which causes injury to one within the protection of the statute is negligence per se and actionable." (citing numerous cases) *Null v. Elec. Power Board of Nashville*, 30 Tenn. App. 696, 707, 210 S.W.2d 490, 494.
>>
>> "In order to found an action on the violation of a statute, or ordinance, * * * the person suing must be such a person as is

> within the protection of the law and intended to be benefited thereby * * * We think that one not a beneficiary of a statute may neither base an action nor a defense on a violation thereof." *Carter v. Redmond*, 142 Tenn. 258, 263, 218 S.W. 217, 218.

*Armstrong*, 385 S.W.2d at 114.

Thus, not every statutory violation gives rise to a negligence *per se* claim. Stated differently, simply referencing the violation of a statute does not necessarily mean that a negligence *per se* claim is being asserted. Messer's complaint, as amended, claims that the $CO_2$ sold *by Cryotech* was adulterated as that term is defined in the FDCA. The complaint, however, was filed against Mellon, Cryotech, and Eastman. Assuming Messer actually was attempting to state a negligence *per se* claim, the complaint is altogether unclear whether such a claim was being made against any defendant other than Cryotech. We also note that while the complaint meticulously sets forth a total of seventeen counts against the various defendants, it fails to mention "negligence *per se*."

In Messer's briefs on appeal in *Messer II* and in the present appeal, its Statement of the Case describes its complaint as bringing claims "under theories of breach of contract, fraud, breach of warranty, misrepresentation, products liability, ultra-hazardous activity, negligence, gross negligence, recklessness, outrageous conduct, intentional concealment, violations of RICO and the Consumer Product Safety Act."[6] Noticeably missing from Messer's own summary of its claims is negligence *per se* or a violation of the FDCA, while all of the other numerous claims are covered.

We will treat the Trial Court's granting of Eastman's motion to strike as, in effect, a denial of a motion to amend the complaint to specifically plead a negligence *per se* claim. Tenn. R. Civ. P. 15.01 provides that leave to amend a pleading "shall be freely given when justice so requires." We have interpreted this provision as substantially lessening the trial court's discretion with regard to permitting parties to amend their pleadings. *See Guarantor Partners v. Huff*, 830 S.W.2d 73, 77 (Tenn. Ct. App. 1992). Even though a trial court's discretion is lessened, it still exists. It is apparent that neither the Trial Court nor Eastman read the complaint as asserting a negligence *per se* claim against Eastman. This conclusion is supported by the record. The issue then becomes whether the Trial Court abused its discretion by not allowing Messer to amend its complaint to assert a negligence *per se* claim. Given that this litigation had been ongoing for years and the vast majority of the discovery as well as two appeals had been concluded, we will not hold that the Trial Court abused its discretion when it refused to allow Messer to amend its complaint at the very last minute to assert a new claim. We affirm the Trial Court's refusal to permit Messer to proceed with a very belated negligence *per se* claim at this point in the litigation.

---

[6] The federal claims alleging a violation of RICO and the Consumer Product Safety Act were dismissed by the Unites States District Court several years ago and are not at issue on this appeal.

**Conclusion**

The Trial Court's grant of summary judgment to Eastman on Messer's claim for breach of warranty is affirmed, as is the Trial Court's refusal to permit Messer to proceed with a negligence *per se* claim. However, we vacate the Trial Court's grant of summary judgment to Eastman on Messer's products liability and negligence claims. This cause is remanded to the Trial Court for further proceedings as necessary and consistent with this Opinion and for the collection of the costs below. Costs on appeal are assessed one-half against the Appellant Messer Griesheim Industries, Inc., and its surety, and one-half against the Appellee Eastman Chemical Company.

_____
D. MICHAEL SWINEY, JUDGE